UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| BIJAN RAFIEKIAN ) | Case Number 1:18-cr-457-AJT-1& 2 |
| ) | |
| and ) | |
| ) | |
| KAMIL EKIM ALPTEKIN, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## ORDER

On December 12, 2018, an indictment was returned against Defendant Bijan Rafiekian ("Rafiekian") [Doc. No. 1]. On March 5, 2019, pursuant to Fed. R. Crim Pro. 17(c)(2), Rafiekian served on non-parties Covington & Burling LLP ("Covington") and Kristen Verderame ("Verderame") a subpoena *duces tecum* for, *inter alia,* these lawyers' files pertaining to their representation of the Flynn Intel Group, Inc. ("FIG") in connection with a March 7, 2017 filing on behalf of FIG under the Foreign Agents Registration Act, 22 U.S.C. § 611, *et seq.*, ("FARA"). On March 29, 2019, the Court held a hearing on Covington and Verderame's motions to quash Rafiekian's subpoenas *duces tecum* [Doc. Nos. 75 and 80] (collectively, the "Motions"), following which the Court ordered Covington and Verderame to produce all fact work product related to and predating the March 7, 2017 filing of the FARA disclosure statement and took under advisement the remaining documents at issue [Doc. No. 93]. For the reasons stated herein, the Court DENIES the motions to quash in their entirety and orders that all documents within the scope of the subpoenas *duces tecum* be produced pursuant to a protective order to be agreed upon by the parties.

1

These Motions arise out of the prosecution of Rafiekian for failing to properly register as an agent of the Turkish government. By way of background, as it appears in the current record, including the indictment issued against Rafiekian and the Motions, events leading to this prosecution began when an op-ed titled *Our Ally Turkey Is In Crisis and Needs Our Support* was published in the newspaper *The Hill* and on its website on November 8, 2016. Lt. Gen. Michael T. Flynn (Ret.) ("Flynn") was listed as its author. Shortly thereafter, the Department of Justice's FARA unit sent a letter to Flynn requesting additional information to determine whether he, FIG, or others had an obligation to register as an agent of a foreign government under FARA. Thereafter, in late December 2016, Flynn retained Covington on behalf of FIG and himself personally to represent them jointly in connection with that inquiry by the Department of Justice; and on March 7, 2017 Covington filed a retroactive statement concerning the involvement of FIG, Rafiekian, and Flynn on behalf of a foreign entity (the "March 7 FARA filing"). Thereafter, Covington continued to represent both FIG and Flynn in connection with investigations by the Special Counsel's Office and the U.S. Attorney's Office for the Eastern District of Virginia concerning the accuracy of the statements made in the March 7 FARA filing.

Subsequently, in the fall of 2017, Flynn began cooperating with the Special Counsel's investigation, and his cooperation was formalized into a plea agreement on December 1, 2017. Pursuant to that cooperation, he authorized Covington in his capacity as CEO and Chairman of FIG's Board of Directors to share with the U.S. Attorney's Office certain information concerning the preparation of the March 7 FARA filing, including authorizing FIG's former in-house General Counsel to be interviewed regarding legal advice that he had provided to FIG prior to Covington's retention regarding whether FIG was required to register under FARA. Pursuant to this authorization, the U.S. Attorney's Office conducted interviews of FIG's prior counsel and

received certain information from Covington regarding the March 7 FARA filing. Covington also, on behalf of FIG and Flynn, authorized the U.S. Attorney's Office to interview Flynn about the FARA submission and the factual information he and others, including presumably Rafiekian, shared or did not share with Covington lawyers who were working on preparing the March 7 FARA filing. Finally, as authorized by Flynn and ostensibly FIG, the U.S. Attorney's Office interviewed Covington lawyers with respect to the factual representations made to them by FIG personnel in connection with the March 7 FARA filing; the source of those factual representations; information concerning who reviewed drafts of the March 7 FARA filing and their comments, corrections, or questions; and how they received communications from FIG personnel concerning the contents of the March 7 FARA filing.

On December 12, 2018, an indictment was filed against Rafiekian and another individual, but not Flynn or FIG. [Doc. No. 1]. Specifically as to Rafiekian, the indictment charges him under 18 U.S.C. § 371 with conspiring with others to (1) act as an agent of a foreign government without prior notification to the Attorney General in violation of 18 U.S.C. § 951; and (2) file a materially false FARA filing in violation of 22 U.S.C. § 618(a)(2). Rafiekian is also charged under 18 U.S.C. § 951 with knowingly acting and causing others to act as an agent of a foreign government, specifically Turkey, without prior notification to the Attorney General. In support of these charges, the government alleges that Rafiekian knowingly provided false information to Covington in an effort to hide from Covington and ultimately the Department of Justice FARA unit the involvement of the Turkish government in what was initially called the Truth Campaign and later became known as Operation Confidence.[1] With respect to Covington's March 7 FARA

---

[1] Specifically, Paragraph 52 of the indictment states:
> From approximately January 2017 through approximately March 2017, [Covington] gathered information to determine whether [FIG] or any of its employees had an obligation to register under FARA based upon [FIG]'s work on "Operation Confidence." During this process, Rafiekian . . .

3

filing, the government alleges that Rafiekian caused Covington to make false statements of material fact and to omit certain facts necessary to make the statements made therein not misleading.

Rafiekian has subpoenaed Covington and Verderame's entire client file pertaining to FIG and the March 7 FARA filing. [*See* Doc. No. 67]. Centrally at issue here are the documents in Category 8 of the subpoena,[2] which requests that Covington and Verderame produce their "FIG client file, including, but not limited to, notes, memoranda, timesheets, billing records, and other documents associated with the FARA filing on behalf of the company." *Id.*

Covington and Verderame object to producing the subpoenaed FIG client file on the following grounds: (1) the requested documents are protected by an unwaived attorney-client and work-product privilege; (2) the subpoena fails to meet the standards of relevancy, admissibility and specificity set forth in *United States v. Nixon*, 418 U.S. 683, 700 (1974); and (3) compliance with the subpoena would be unduly burdensome since the client file includes more than two years' worth of documents and it would be difficult to distinguish between those relating to their representation of FIG and those relating only to their representation of Flynn personally.

With respect to the asserted privilege, the threshold issue is not one of waiver, but whether the privilege is even implicated; that is, whether it may be asserted against Rafiekian, a director, officer, and major shareholder of FIG.

---

knowingly provided false information to [Covington] in an effort to hide from the attorneys – and ultimately from the FARA Unit – the involvement of Turkish government officials in the project.
[Doc. No. 1 at ¶ 52].

[2] The parties appear to agree that there are no outstanding issues with respect to Categories 1-7 of the subpoena as to Covington. However, Verderame, whose representation largely related to the creation and corporate governance of FIG, has advised the Court that while she has produced some documents in Categories 1-7, she has not produced others in the absence of a court order because of the possibly privileged nature of those documents, particularly within Category 4, pertaining to "any and all engagement letters executed on behalf of FIG with [the] law firm." [Doc. No. 67].

4

Covington and Verderame claim that notwithstanding Rafiekian's status as an officer, director and major shareholder of FIG, FIG's privilege may be asserted by Flynn on behalf of FIG to prevent Rafiekian's access to the subpoenaed corporation-related documents because Rafiekian is in a different position relative to the privilege than Flynn. In that regard, they contend that Rafiekian is precluded from obtaining the subpoenaed documents because Flynn, as a "superior officer" within FIG, is solely authorized to decide on behalf of FIG whether the privilege should be asserted or waived, and has decided to assert the attorney-client and work-product privilege as to the subpoenaed documents and directed Covington and Verderame to do so. At the March 29, 2019 Motions hearing, Covington candidly conceded that had Flynn been prosecuted for a FARA violation, he, by virtue of his position as Chairman and CEO of FIG, would be entitled to access those documents that Rafiekian has subpoenaed, and that the subpoenaed documents could not be withheld on the basis of privilege had Flynn, rather than Rafiekian, issued the subpoena. In short, Covington contends that by virtue of his position as Chairman of FIG's Board of Directors, Flynn is entitled to full access to those documents, and Rafiekian is not. For the following reasons, the Court concludes that Flynn and Rafiekian are comparably situated as to FIG. As such, they are entitled to the same access to documents in the hands of FIG's lawyers, including client files pertaining to legal advice furnished to FIG during their time as directors, even where such information and documents would otherwise be privileged.

Courts generally, including Delaware courts,[3] have recognized and accepted as a general proposition that corporate directors have unfettered access to corporate information, including corporate information in the files of its lawyers. *See, e.g., Kalisman v. Friedman*, 2013 WL

---

[3] The parties agree that because FIG is a Delaware corporation, Delaware corporate law governs questions regarding the rights of its directors.

1668205, at *3 (Del. Ch. Apr. 17, 2013) ("A director's right to information is 'essentially unfettered in nature.'"); *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1996 WL 307444, at *4-6 (Del. Ch. June 4, 1996), *appeal refused*, 682 A.2d 625 (Del. 1996) (recognizing director's "legal right of equal access to 'board information,'" including legal advice furnished to the corporation); *Gottlieb v. Wiles*, 143 F.R.D. 241, 247 (D. Colo. 1992) ("An attorney may not withhold work product from his own client. In the corporate setting, this principle would clearly require counsel to provide work product to the company's board of directors."). Even a former director has access to such information if the information pertains to the period during which he served as a director. *See Moore*, 1996 WL 30744, at *4; *Kirby v. Kirby*, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987); *Gottlieb*, 143 F.R.D. at 247. Only where a director's access is for a purpose unrelated to the interests of the corporation or for a purpose adverse to the corporation has access been restricted. *See Kalisman*, 2013 WL 1668205 at *5-6; *Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993); *State ex. Rel. Farber v. Seiberling Rubber Co.*, 168 A.2d 310, 312 (Del. Super. Ct. 1961). These principles apply with even more force within the context of a closely held corporation, where the interests of the corporation are essentially defined by the interests of its directors and shareholders. In that regard, courts have recognized that the distinction between a corporate entity and its constituents dissipates within the context of a closely held corporation, where the interests of the corporate entity and those of its directors and shareholders blur and often conflate.[4]

---

[4] As one judge has observed:

> The most significant or perhaps sole relevant interests in a closely held corporation might be those of the constituents, that is, the shareholders and the directors. A closely held corporation may be a separate legal entity for purposes of its relations with outsiders, but with respect to its constituents (that is, intra-entity relations), the fictional "entity" may have little, if any, import.

*Lane v. Sharp Packaging Sys., Inc.*, 251 Wis.2d 68, 131 (2002) (Abrahamson, C.J., dissenting).

6

At all times material to the Motions, Flynn and Rafiekian were FIG's only two directors.[5] In its by-laws, Rafiekian was designated as Chairman of the Board, [Doc. No. 53-1 at 10], but at some point, Flynn assumed the title of Chairman and Rafiekian as Vice Chairman. Flynn also served as the Chief Executive Officer of FIG, and Rafiekian, its President, Secretary, and Treasurer. Flynn owns 350,000 of FIG's authorized shares and Rafiekian owns 300,000 shares. At least as reflected in the FARA filing, Flynn and Rafiekian's operational roles within the company appear comparable. [*See* Doc. No. 30-2 at 4-5]. Ostensibly in recognition of his status as a director, officer and major shareholder, Rafiekian's consent was obtained before Covington entered into a limited waiver of FIG's privilege as to its former counsel's advice and Rafiekian contributed his share of Covington's fees for its representation of FIG in connection with the March 7 FARA filing. For these reasons, the interests of FIG appear to largely conflate with the interests of Rafiekian and Flynn, as they are FIG's only officers, directors and shareholders. Under these circumstances, courts have viewed the directors of a corporation, in this case, Rafiekian and Flynn, as the joint clients of the corporation's lawyers, together with the corporate entity itself. *See, e.g., Kirby*, 1987 WL 14862, at *7.[6]

Covington contends that even if Rafiekian and Flynn are comparably situated relative to FIG, Flynn's assertion of the privilege on behalf of FIG is appropriate since Rafiekian is seeking

---

[5] The record reflects that when FIG was first established, there were other shareholders and a third director; but the Court was advised at the March 29 Motions hearing that in 2016, the other shareholders liquidated their interests and the Board of Directors was reduced to just Flynn and Rafiekian.

[6] In describing a similar situation involving the assertion of the attorney-client privilege by a corporation against its former director, the *Kirby* court stated:

> The issue is not whether the documents are privileged or whether plaintiffs have shown sufficient cause to override the privilege. Rather, the issue is whether the directors, collectively, were the client at the time the legal advice was given. . . . The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.

1987 WL 14862, at *7.

the documents for a personal use, specifically to prepare his defense in the criminal case against him, and not for a corporate purpose. In this regard, Covington compares Rafiekian's objectives to Flynn's when he decided whether and to what extent to authorize Covington's disclosures of privileged documents to law enforcement. According to Covington, "FIG faced a clear threat of criminal action and had a powerful incentive to take legitimate action to avoid prosecution and any penalties that might flow to FIG and its shareholders." [Doc. No. 89 at 13]. It further contends that after "[c]arefully weighing the manifest risk of prosecution and the potential benefits of cooperation – from avoiding prosecution entirely to receiving a reduced sentence if prosecuted – General Flynn upheld his fiduciary duty to exercise privilege in FIG's best interest by determining that cooperation with the government was the prudent course. Later events prove the wisdom of that course – the government did not pursue charges against FIG." *Id.*

Flynn's assertion of the privilege against Rafiekian on these grounds is problematic for several reasons. First, as discussed above, they are both directors of FIG and, as Covington concedes, Flynn has access to the same documents that Rafiekian has subpoenaed; and notwithstanding their different titles, Flynn's positions as a director or officer do not confer upon him the ability to preclude Rafiekian, FIG's only other director, access to the same documents he has access to. *See Kalisman*, 2013 WL 1668205 at *4 (finding that a corporation "cannot pick and choose which directors get information by asserting the attorney-client privilege against [one director] but not against [others]").

Nor does Rafiekian's purpose in accessing those documents allow Flynn to preclude him from accessing them. Rafiekian is being prosecuted on the basis of the same March 7 FARA filing that would have formed the basis for prosecuting both Flynn and FIG. As Covington acknowledges in support of its position, FIG may be held criminally liable if its agents were

8

acting within the scope of their employment when engaging in criminal conduct, and any criminal conduct on the part of Flynn or Rafiekian with respect to the March 7 FARA filing could therefore be imputed to FIG. For this reason, according to Covington, Flynn was pursuing a corporate purpose when he waived the privilege in order to cooperate with the government and avoid prosecution of himself and FIG. But by the same reasoning, Rafiekian's access to the subpoenaed documents would serve the same corporate purpose of aiding Rafiekian in his defense, and through that defense, avoiding criminal responsibility for both Rafiekian and FIG. In short, it is difficult to see any less corporate or more personal purpose in Rafiekian's objectives than in Flynn's objectives in turning over documents and waiving privilege in order to avoid prosecution for himself and FIG. Moreover, Rafiekian's purpose in seeking the subpoenaed documents is not adverse to FIG's interests; Rafiekian is not seeking those documents for the purpose of pursuing a claim against FIG, but rather for the purpose of defending himself, and by extension FIG, against criminal charges.[7]

Finally, Flynn and Rafiekian appear adverse to each other at this point.[8] Given their status as joint clients for the purposes of the company's corporate representation, with equal access to legal advice rendered to FIG by Covington, and "[b]ecause each client has equal rights to the protection of the privilege, one of the joint clients cannot assert the privilege against the other if

---

[7] For this reason, this case is fundamentally distinguishable from those cases that have found that directors have no right to inspect corporate records where their purpose for doing so is adverse to the interests of the corporation. *See e.g., State ex rel. Farber v. Seiberling Rubber Co.*, 168 A.2d 310 (Del. Super. Ct. 1961).

[8] The adversity between Flynn and Rafiekian is also reflected in the circumstances surrounding the purported dissolution of FIG, which, according to Rafiekian and without any explicit denial by Flynn, was done by Flynn without Rafiekian's consent through a filing that falsely represented that the dissolution was with the unanimous consent of the directors or the shareholders or of a majority of the shareholders at a shareholders meeting. *See* [Doc. No. 88 at 5, n.11]. Rafiekian contends that FIG's dissolution should be disregarded in considering Rafiekian's rights to access the subpoenaed documents, given his status as a director. At the March 29 Motions hearing, Covington took the position that FIG's dissolution is irrelevant to whether Rafiekian is entitled to obtain the subpoenaed documents; and the Court therefore finds no need to determine the validity *vel non* of FIG's dissolution or the truthfulness of any documents filed in connection with that dissolution.

they subsequently become adversaries." *Kalisman*, 2013 WL 1668205 at *4 (internal quotation marks and alterations omitted). For all the above reasons, FIG's attorney-client and work-product privileges may not be asserted against Rafiekian to avoid production of the subpoenaed documents.[9]

Covington next contends that in any event, Rafiekian's subpoena must be quashed as to Category 8 because it fails to satisfy the *Nixon* requirements of relevance, admissibility and specificity.[10] The relevance of the subpoenaed documents must be assessed within the context of the allegations of the indictment. In that regard, the charges against Rafiekian, at their core, are that Rafiekian caused Covington to file a false FARA filing. For this reason, central to this case is what Covington put or did not put in its FARA filing, and why; and anything Covington received, understood, or thought about its FARA filing, either before or after the filing, is relevant to the charges against Rafiekian and Rafiekian's reliance on counsel defense. What Covington knew and thought regarding the March 7 FARA filing appears to go to the heart of this prosecution.

As to admissibility, and for essentially the same reasons, all of the information in Covington's file relating to the March 7 FARA filing has enough facial admissibility at this point to satisfy the second *Nixon* prong.[11] A central issue in this prosecution is whether Rafiekian

---

[9] Even if the privilege could be asserted against Rafiekian, it would be inappropriate for Flynn, rather than an unconflicted decision maker such as a properly appointed independent counsel or committee, to decide whether to assert FIG's privilege against Rafiekian, as any assertion of the privilege on behalf of FIG arguably works to Flynn's personal advantage and Rafiekian's detriment.

[10] It is not clear that the *Nixon* requirements apply here, as this subpoena arises in a fundamentally different context and between differently situated parties than in *Nixon*. See *United States v. Nachamie*, 91 F. Supp. 2d 552, 562-63 (S.D.N.Y. 2000) ("Because the Rule states only that a court may quash a subpoena if compliance would be unreasonable or oppressive, the judicial gloss that the material sought must be evidentiary – defined as relevant, admissible and specific – may be inappropriate in the context of a defense subpoena of documents from third parties.") For purposes of the Motions, the Court assumes, without deciding, that they do apply.

[11] The prospect that Covington's file contains admissible evidence at trial is increased by the prospect that some Covington lawyers may be called as witnesses.

knowingly caused Covington to file a false FARA statement and knowingly acted as a foreign agent without proper notification to the Attorney General. Covington's file likely contains admissible evidence concerning the March 7 FARA filing, including the Covington lawyers' state of mind as to that filing and Rafiekian's *mens rea*, as possibly reflected in, *inter alia*, recorded recollections and documents qualifying as business records. Included within these categories of admissible evidence may be evidence of what information Rafiekian provided to Covington and what information Covington otherwise had; Covington's views, beliefs, assumptions, and assessments concerning the information it received; and Covington's concerns about the adequacy or accuracy of the information it received. With respect to Rafiekian's *mens rea*, probative admissible evidence may also include non-hearsay verbal facts, such as what questions Covington asked Rafiekian and his responses and Covington's explanations to Rafiekian concerning the purpose of the FARA filing and the required scope of disclosures. The file may also contain admissible impeachment material, a category of evidence whose production in advance of trial the *Nixon* Court sanctioned where, as here, there were also "other valid potential evidentiary uses for the same material." 418 U.S. at 701-02. Overall, the circumstances surrounding the subpoenaed documents are exceptional and the subpoenaed documents likely contain information not obtainable from any other source.

The request for documents under Category 8 of the subpoena also satisfies the *Nixon* specificity requirement since the request relates solely to documents from Covington and Verderame's FIG client files that pertain to the March 7 FARA filing, whether they were produced before or after the filing. This discrete and readily identifiable set of documents is sufficiently specific for Covington and Verderame to identify the documents sought pursuant to the subpoena.

Covington and Verderame also claim that compliance with the subpoena would be unduly burdensome since the client files sought in Category 8 include, in Covington's case, more than two years' worth of documents and would require them to distinguish between those documents relating to FIG and those relating only to the representation of Flynn in his personal capacity. The Fourth Circuit has found that a subpoena is unduly burdensome if it is "abusive or harassing; overly vague; or excessively broad." *United States v. Rand*, 835 F.3d 451, 463 (4th Cir. 2016) (internal quotation and citation omitted). The subpoenas at issue here are none of those things, as they identify a discrete subset of documents that are central to Rafiekian's defense – specifically, Covington and Verderame's FIG client files related to the March 7 FARA filing. Covington complains that its files contain information that pertain both to its representations of FIG as it relates to the FARA filing and to Flynn personally; but that circumstance likely reflects simply the unity of interests between FIG, a closely held corporation, and its directors and officers, and that the interests of one were in many instances indistinguishable from the interests of the other. In any event, all documents pertaining to FIG's March 7 FARA filing would need to be produced even if those documents also related to Flynn's representation. To the extent that that the same files contain documents pertaining to the representation of Flynn and not the March 7 FARA Filing, any burden associated with segregating those documents is based on how counsel decided to maintain their client files and cannot relieve them of their production obligations.

Finally, because some of the subpoenaed documents may remain privileged as to third-parties, the Court will order that Covington and Verderame's production be subject to a

protective order to be agreed upon by the parties, with any issues in that regard brought promptly to the Court's attention.[12]

For the foregoing reasons, it is hereby

ORDERED that Non-Party Covington & Burling LLP's Motion to Quash in Part [Doc. No. 75] and Non-Party Kristen Verderame's Rule 17(c)(2) Motion to Quash [Doc. No. 80] be, and the same hereby are, DENIED; and all documents within the scope of the subpoenas *duces tecum* be produced on or before April 20, 2019 pursuant to a protective order to be agreed upon by the parties.

The Clerk is directed to forward copies of this Order to all counsel of record

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 9, 2019

---

[12] There is no need at this point for the Court to formally rule on any issues pertaining to the use of the subpoenaed documents at trial based on any still-intact privilege or any other reason.

13