```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,     )  Case 1:18-cr-00457
                                   )
 4               Plaintiff,        )
                                   )
 5        v.                       )  Alexandria, Virginia
                                   )  June 13, 2019
 6   BIJAN RAFIEKIAN,              )  10:03 a.m.
     and                           )
 7   KAMIL EKIM ALPTEKIN,          )
                                   )
 8               Defendant.        )
                                   )  Pages 1 - 80
 9

10              TRANSCRIPT OF MOTIONS HEARING

11        BEFORE THE HONORABLE ANTHONY J. TRENGA

12          UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

2

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3         JAMES P. GILLIS, ESQUIRE
          EVAN N. TURGEON, ESQUIRE
4         OFFICE OF THE UNITED STATES ATTORNEY
          2100 Jamieson Avenue
5         Alexandria, Virginia  22314
          (703) 299-3700

6
     FOR DEFENDANT BIJAN RAFIEKIAN:
7
          ROBERT P. TROUT, ESQUIRE
8         TROUT, CACHERIS & SOLOMON, PLLC
          1627 I Street, N.W., Suite 1130
9         Washington, D.C.  20006
          (202) 464-3300
10
          MARK J. MACDOUGALL, ESQUIRE, *PRO HAC VICE*
11        STACEY H. MITCHELL, ESQUIRE, *PRO HAC VICE*
          JOHN C. MURPHY, ESQUIRE, *PRO HAC VICE*
12        SAMANTHA BLOCK, ESQUIRE, *PRO HAC VICE*
          ADAM A. BERESTON, ESQUIRE, *PRO HAC VICE*
13        AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
          Robert S. Strauss Building
14        1333 New Hampshire Avenue, N.W.
          Washington, D.C.  20036-1564
15        (202) 887-4000

16   FOR DEFENDANT KAMIL EKIM ALPTEKIN:

17        RODNEY F. PAGE, ESQUIRE
          JENNIFER KIES MAMMEN, ESQUIRE
18        BRYAN CAVE LEIGHTON PAISNER LLP
          1155 F Street, N.W.
19        Washington, D.C.  20004-1357
          (202) 508-6000
20

21

22

23

24

25

1              THE CLERK:  Criminal Case 1:18-cr-457, *United*
2  *States v. Bijan Rafiekian* and Kamil Alptekin.
3              Counsel, will you please note your
4  appearances for the record.
5              MR. GILLIS:  Good morning, Your Honor.  Jim
6  Gillis and Evan Turgeon for the United States.
7              THE COURT:  Good morning.
8              MS. MITCHELL:  Good morning, Your Honor.
9  Stacey Mitchell on behalf of the defendant.  I'm joined
10  by Mark MacDougall, Robert Trout, Jack Murphy, Samantha
11  Block, and Adam Bereston.
12              THE COURT:  All right.  Welcome to everyone.
13              MS. MITCHELL:  Thank you.
14              THE COURT:  We're here on a number of
15  motions.  What I'd like to do is first take up the
16  motions pertaining to the privileged information and
17  the crime-fraud exception.  I think we have several
18  that are related that fall into that category.  I
19  think, for the purposes of facilitating argument, I'd
20  like to essentially cover all the issues in those
21  motions, including the government's motion for crime
22  fraud, Defendant Rafiekian's motion to exclude the
23  information.
24              In that regard, we have Defendant Alptekin's
25  motion -- Mr. Page's motion for leave for a special

1  appearance.  I'm going to grant that motion and allow

2  Mr. Page to appear solely for the purposes of the

3  government's motion on the crime-fraud exception.

4            MR. PAGE:  Thank you.

5            THE COURT:  All right.  I've read most of

6  what you-all have given me.  We were in trial all week,

7  and I haven't looked at it in as much detail as I need

8  to and will, but I have reviewed all of them to a

9  certain extent and do have a sense of what the various

10  positions are, but would be pleased to hear further

11  from counsel.

12            Mr. Gillis, let me begin with you.

13            MR. GILLIS:  Thank you, Your Honor.

14            Your Honor, as we quoted in our response to

15  Alptekin's response to our motion to establish the

16  crime-fraud exception and as we alluded to in the

17  response to Rafiekian's response to our motion --

18            THE COURT:  Don't the issues conflate to a

19  certain extent between what you want to get into, the

20  crime-fraud exception, and what you want to get in on

21  the grounds that the communications were never

22  privileged at all because they were provided for the

23  purposes of a public filing?

24            MR. GILLIS:  Yes, Your Honor.  Yes.  I would

25  take up the crime-fraud exception because I think it's

1  a clearer example, and it would dispose of the second

2  question.  The statements that were made with respect

3  to whether they were intended for public disclosure --

4           May I have a moment, Your Honor?

5           THE COURT:  Yes.

6           MR. GILLIS:  Your Honor, we had divvied up

7  the handling of the motions.

8           Every time I hear a defense counsel talk

9  about the vast resources of the federal government, I

10 wish people could see me and Evan and John trying to

11 respond to the mountain of motions that were filed by

12 an Army of well-paid associates, each of whom makes

13 more than I do.  So I do apologize to the extent that

14 our pleadings were not of the same length as the

15 defendant's.

16          Evan will be arguing -- Mr. Turgeon will be

17 arguing the question of whether they are privileged in

18 the first place because of the intention to disclose

19 them.  And if the Court permits, I would argue the

20 crime-fraud exception.

21          THE COURT:  All right.  That's fine.

22          MR. GILLIS:  Okay.  So with respect to the

23 crime-fraud exception, Your Honor, the Fourth Circuit

24 standard is clear.  We must establish two prongs:

25          1.  That the client was engaged in or

1  planning a criminal or fraudulent scheme when he sought

2  the advice of counsel to further the scheme; and

3          2.   That the statements contained in the

4  privileged information bear a close relationship to the

5  client's existing or future scheme.

6          THE COURT:  What about the defendant's

7  position -- I believe it's Rafiekian's position -- that

8  what you're trying to seek under the crime-fraud

9  exception is attorney opinion work product and that for

10  that purpose you need to allege what you have

11  explicitly disclaimed, the involvement of the lawyers?

12          Now, I know the view that that's opinion work

13  product is something that may be more specific to the

14  Fourth Circuit, but how do you respond to that

15  position?

16          MR. GILLIS:  Well, Your Honor, first of all,

17  that is a privilege that must be invoked and

18  established by the person raising it.  In this case, in

19  a response almost as an afterthought, they raised this

20  question about opinion work product.  They have not

21  provided to the Court any evidence to establish that

22  there was any litigation contemplated unless

23  Mr. Rafiekian was contemplating being prosecuted at the

24  time.  But even that, I don't think, would apply in

25  this situation.  So they haven't, in the first place,

1  established their right to -- they haven't established

2  that the work product doctrine applies in the first

3  place.

4            The Fourth Circuit law, as well as every

5  other circuit -- indeed, the Supreme Court makes it

6  abundantly clear that that is the burden to

7  establish -- that is Rafiekian's burden to establish,

8  which he argues something about the opinion work

9  product, but he does not, in the first place, establish

10 it, nor assert what is the litigation that was

11 supposedly in contemplation when the FARA filings were

12 made and when these other activities were undergoing.

13 So there is no privilege for it.

14            Further, the -- well, I would leave it there,

15 Your Honor, unless you have further questions about it.

16            THE COURT:  No.  Your view is that since the

17 recollections of the lawyer were with respect to

18 communications that weren't made in anticipation of

19 litigation, that there's no opinion work product to

20 even be protected?

21            MR. GILLIS:  No, Your Honor.  Further, they

22 haven't even raised it.  They haven't established what

23 litigation was contemplated.

24            The Fourth Circuit, as well as several

25 others, have held that the claimed opinion work

1   product -- and work product in general, actually, must

2   be created because of anticipated litigation.

3           THE COURT:  You don't think that the DOJ

4   inquiry into whether FIG and its principals were

5   obligated to file was within a sufficiently adversarial

6   context for the work product privilege to apply?

7           MR. GILLIS:  No, sir, Your Honor.

8           THE COURT:  All right.

9           MR. GILLIS:  Also --

10          THE COURT:  Go ahead.

11          MR. GILLIS:  If they raised the privilege, we

12  would request the opportunity to respond to that more

13  fully in further briefing.

14          THE COURT:  All right.

15          MR. GILLIS:  Now, with respect to the

16  attorney-client privilege, the grand jury's finding of

17  probable cause as to the existence of the conspiracy,

18  Your Honor, is compelling and essentially unreviewable.

19  With all due respect to the Court, I think the Supreme

20  Court has made abundantly clear in similar contexts, as

21  they say in case after case, implying most recently

22  that it's not going to be limited to the context in

23  which that case was decided.  But in case after case, a

24  decision by the court of appeals -- or rather by the

25  grand jury cannot be challenged.  And as they say, the

1 whole history of the grand jury institution

2 demonstrates that a challenge to the reliability or

3 competence of the evidence supporting the grand jury's

4 finding of probable cause will not be heard.  That's

5 *Kaley*, K-A-L-E-Y.

6         THE COURT:  Right.

7         MR. GILLIS:  It's in our briefs, Your Honor.

8         THE COURT:  I think they focus on the second

9 prong, and that is that there's no adequate showing

10 that the communications were made in furtherance of

11 covering up or furthering the crime.

12         MR. GILLIS:  That is correct, Your Honor.

13 Well, actually, they devote pages to the question of

14 whether there's sufficient evidence.

15         THE COURT:  I understand.

16         MR. GILLIS:  Okay.  So, Your Honor, as to the

17 evidence that Rafiekian's statements to Covington and

18 Verderame and, if you'd like me to cover it as well,

19 Alptekin's statements --

20         THE COURT:  Please.

21         MR. GILLIS:  -- to Arent Fox.

22         And I'd like to, if I may, take a moment just

23 to emphasize what's in our papers in case anybody in

24 the audience has not read them.  We make no contention

25 whatsoever that any of those attorneys were in any way

1  involved in a crime of fraud or that they otherwise

2  knew what the defendant was up to.

3         Now, with respect to that, the Fourth

4  Circuit -- unlike some other circuits, but the Fourth

5  Circuit standard is only that it bear a close

6  relationship to the client's existing or future scheme.

7         Now, with respect to the close relationship,

8  the statements that were made to Covington and

9  Verderame had everything to do with the Turkey project

10  to undermine -- to provide derogatory information as to

11  Gulen.

12         THE COURT:  As I gather the thrust of their

13  position, though, the statements that you're relying on

14  don't link up with what is claimed to be the false

15  statements in the FARA filing.

16         MR. GILLIS:  Your Honor, as to that -- so the

17  evidence shows that, first of all, Rafiekian's

18  statements to Covington and to Verderame were

19  incorporated directly into the FARA filing that

20  repeated these false statements.  So a closer

21  relationship to the false statements in the FARA filing

22  could not be thought of.

23         His lies to his attorneys concealed the

24  involvement of the government of Turkey.  He repeatedly

25  claimed that the government of Turkey was not involved,

1  that it was only Inovo.

2         He lied about payments made to Alptekin,

3  which are clearly -- in the documentary evidence that

4  we submitted, it show that those payments were

5  allegedly for consulting fees.  He claimed they were

6  for refunds even when confronted with evidence to the

7  contrary.

8         He was questioned about evidence.  The

9  e-mails that are the very evidence that we submitted to

10 the Court in support of the conspiracy, he was

11 questioned about those e-mails by the attorneys.  And

12 his responses to all of those questions bears a very

13 close relationship to the criminal conspiracy that's

14 been found by the grand jury.

15         With respect to Alptekin --

16         THE COURT:  With respect to Rafiekian --

17         MR. GILLIS:  Yes, sir.

18         THE COURT:  -- are you -- one of the issues I

19 have is how the Court is to deal with these various

20 issues without a statement-by-statement consideration

21 and whether the Court needs some kind of an evidentiary

22 hearing *ex parte* or otherwise on that point.

23         Are you seeking to introduce anything that's

24 not referenced in the indictment as statements to

25 Covington by Rafiekian?

1              MR. GILLIS:  I beg your pardon?  By?

2              THE COURT:  Rafiekian to Covington.

3              MR. GILLIS:  We do, Your Honor.  We plan to

4    call at least one attorney from --

5              THE COURT:  How is the Court supposed to know

6    what those statements are before you present them?

7              MR. GILLIS:  Well, Your Honor, to the extent

8    that -- the entire relationship is infected with this

9    conspiracy, Your Honor.  Everything that Rafiekian told

10   him, in connection with those filings, were in

11   furtherance of the crime.  A statement-by-statement

12   elicitation of what Rafiekian said to the attorneys

13   that might be introduced at trial would take a

14   considerable amount of time, Your Honor.

15             If the Court desires, we could produce the --

16   *ex parte*, we could produce the 302s of those lawyers.

17   In fact, I believe that the defense has already had

18   access to those 302s.  I haven't -- we haven't heard

19   from them what specific statements in those 302s they

20   believe are not covered by --

21             THE COURT:  What about this notion that the

22   Covington representation really was in phases:  The

23   initial phase was really an information-gathering phase

24   for the purpose of making a determination and to

25   provide legal advice as to whether there should be a

1  filing, and it was only after that judgment was made,

2  based on communications that were provided for that

3  purpose, that Covington then made a filing that relied

4  on certain of those statements for the purposes of the

5  filing?

6           MR. GILLIS:  Yes, Your Honor.  That entire

7  period is covered by the conspiracy as found by the

8  grand jury.  So the crime existed during that period.

9           The fact-gathering by Covington, with respect

10 to whether a FARA filing should be made, hinged upon

11 what they were told by Rafiekian concerning whether the

12 government of Turkey was involved, what his responses

13 were to some of the e-mails that they uncovered during

14 the course of their --

15           THE COURT:  But in the absence of a FARA

16 filing, you wouldn't be able to put those in evidence;

17 would you?

18           MR. GILLIS:  Yes, Your Honor, because they

19 would be probative certainly of the existence of the

20 conspiracy.  The conspiracy was complete upon the

21 agreement and didn't require any FARA filing at all.

22 So what took place thereafter is certainly probative of

23 his intent to conceal and to carry out the conspiracy.

24           But even if there was nothing that took place

25 after the FARA -- even if there was no FARA filing,

1  Your Honor -- first of all, that would be in

2  furtherance of the crime itself.  Because if they

3  concluded, based upon the defendant's statement, that

4  no FARA filing was necessary, that would have been

5  basically a completion of the scheme.

6          But, Your Honor, in this case, the

7  undertaking by Covington determined whether a FARA

8  filing was necessary was based both upon the statements

9  that Rafiekian made to them and those that he made to

10 Verderame that were then transmitted to Covington.

11         THE COURT:  All right.  The one question I

12 have -- I guess it's more for Mr. Page with respect to

13 Alptekin -- is how the Arent Fox opinion letter

14 survives any privilege claim once it's turned over to

15 Rafiekian.

16         MR. GILLIS:  That's a good question, Your

17 Honor.  Could I have a moment, Your Honor?

18         THE COURT:  Yes.

19     (Counsel confer.)

20         MR. GILLIS:  With respect to the more recent

21 questions that the Court had at the end of my argument,

22 Mr. Turgeon would like to respond to some of those

23 questions directly.

24         THE COURT:  All right.

25         MR. GILLIS:  So, Your Honor, we submit that

1   the crime, as established by the grand jury's finding,

2   that the Fourth Circuit requires only a close

3   relationship to the client's existing or future scheme,

4   all of the statements that they made to Covington were

5   in the context of determining whether to file a FARA

6   filing and whether to -- and what that FARA filing

7   would contain.  All of those communications -- well,

8   first of all, none of those communications, apart from

9   that, would be introduced because they wouldn't be

10  relevant.  To the extent that they're relevant to those

11  determinations, Your Honor, they're infected entirely

12  with the crime or fraud that he was up to during the

13  course of that consultation.

14          If the Court has no further questions as to

15  that, I can pass on to Alptekin's argument.

16          THE COURT:  All right.  Let me just ask this

17  because it was raised obliquely in Rafiekian's

18  opposition, but it was certainly the central point in

19  their pending motion to dismiss, which the government

20  hasn't responded to yet.  That is this notion that an

21  essential element of this crime is that there was no

22  illegal commercial transaction and that in order to

23  establish the crime-fraud exception, there's been no

24  showing that there was a crime because there's no

25  showing that this was not a legal commercial

1  transaction.

2          How do you respond to that whole line of

3  argument?

4          MR. GILLIS:  One moment, Your Honor.

5      (Counsel confer.)

6          MR. GILLIS:  Your Honor, it was alluded to,

7  and we would like the opportunity to -- Your Honor,

8  that's in the motion they just filed, and we have not

9  yet responded to that.  But I can try to on the fly --

10          THE COURT:  Give me a preview.

11          MR. GILLIS:  I'll try to give you a preview,

12  if I may, off the top of my head.  My colleagues may do

13  a much better job.  So I don't want to prejudice their

14  arguments later on.

15          But, Your Honor, with respect to whether this

16  was a lawful commercial transaction, it clearly was

17  not, as basically the jury has already found based upon

18  its finding of a criminal scheme.  If their point is

19  that that must be alleged in order for the indictment

20  to not be defective, that is something that we could

21  correct with a brief superseding indictment.  But I

22  submit that I believe our briefings will show that

23  that's not necessary because of the way in which it's

24  phrased in the statute.  We have charged the statutory

25  language.  To the extent that there are other elements

1  to that that they believe negate those elements of the

2  offense --

3        THE COURT:  But is it the case, as far as

4  you're concerned, that there is no filing requirement

5  if it pertains to a legal commercial transaction?

6        MR. GILLIS:  As to that, Your Honor, I'm

7  going to have to defer to the experts who will be

8  responding to that motion.

9        THE COURT:  All right.

10       MR. GILLIS:  Would you like to hear argument

11  on the Alptekin crime-fraud --

12       THE COURT:  Yes.

13       MR. GILLIS:  With respect to Alptekin's

14  allegation -- or rather attorney-client privilege,

15  those allegations were carried directly forward into

16  the -- rather that -- first of all, I'll start with the

17  premise I stated before, which is the grand jury

18  establishes the first prong.

19       With respect to the second prong, his

20  statements to Arent Fox after the fact, while entirely

21  self-serving, demonstrate -- because they are

22  internally false based upon the evidence that the Court

23  already has -- the assertions in there concerning who

24  the client was, what the purpose of the retention of

25  FIG was, all of those things the evidence strongly

1  refutes.

2          In fact, in Mr. Alptekin's initial response

3  to our motion, he says that Alptekin retained FIG

4  through his Dutch company.  It was his hope that

5  ultimately the Turkish government would take over and

6  enlarge the scope.

7          He told the FBI that there was this project

8  beforehand, but that the Turkish government dropped the

9  ball, to use his words, and that, as a consequence of

10 that, he went forward.  That's his claim.  Obviously,

11 we submit that that is false.

12         Now, even in his own pleadings, he has given

13 a conflicting statement to what is in his statements to

14 the FBI, as well as inferentially in what he told Arent

15 Fox.  That does not appear, I don't believe, in any of

16 the Arent Fox opinion letter, that allegation.

17         So his statements -- again, the Arent Fox

18 allegation or -- in this Arent Fox opinion letter

19 recounting what the defendant said are also very

20 closely related to the conspiracy because they

21 reiterate the falsity of statements made in the FARA

22 filing.

23         They also are linked with other false

24 statements made by Rafiekian.  There's false, but

25 consistent, statements that they make in different

 1  contexts and different forums or in different writings.

 2  So they are very closely related to the fraud.  Indeed,

 3  this letter entirely relates to this Turkey project.

 4  It doesn't relate to anything else.  So, clearly,

 5  whatever he told Arent Fox, in connection with that,

 6  related directly to this conspiracy.

 7            THE COURT:  All right.  Let me ask you a more

 8  general question.  I'm trying to get a better sense of

 9  what the government's views are on this.  Let's assume

10  the evidence were nothing more than that the Turkish

11  government hired Company B and gave a general view of

12  what it wanted Company B to do and Company B then hired

13  Company A -- all right.

14            MR. GILLIS:  Yes, Your Honor.

15            THE COURT:  -- and with no further

16  involvement of the Turkish government.  Is that, under

17  the government's view, sufficient to establish the

18  offenses in this indictment?

19            MR. GILLIS:  The offense, Your Honor,

20  requires direction or control by the foreign

21  government.

22            THE COURT:  Right.

23            MR. GILLIS:  So, in your hypothetical, Your

24  Honor, I think it would depend upon what the agreement

25  was between the Turkish government and Alptekin and

1  what he conveyed to FIG.

2          We have -- because both the Flynn Intel Group

3  and Inovo have been mentioned in the pleadings and are

4  also in the media but also in our own pleadings, we

5  have dispensed with the Company A, Company B aliases.

6          So it would depend upon what that agreement

7  was.  At bottom, the law -- the violation is to agree

8  to operate under the direction or control --

9          THE COURT:  I guess my question is what has

10  been presented so far, either in the indictment or in

11  the exhibits, that have been attached to your motions

12  that shows anything beyond what I just outlined in very

13  general fashion?

14          MR. GILLIS:  I'm sorry?

15          THE COURT:  What have you presented, either

16  by way of the indictment or in the exhibits, that are

17  attached to your motion that really shows anything

18  beyond what I just generally outlined?

19          MR. GILLIS:  May I take a moment, Your Honor?

20          THE COURT:  Yes.

21          MR. GILLIS:  Your Honor, the evidence that it

22  was more than merely the hiring by the Turkish

23  government and that there was this conspiracy to

24  conceal the relationship between FIG and the government

25  of Turkey include the following:  Rafiekian and

1  Alptekin were at pains to keep secret their dealings

2  with --

3           THE COURT:  Well, that's a conclusion.

4  That's a characterization.  What are you pointing to

5  for that?

6           MR. GILLIS:  As to the evidence, Your Honor?

7           THE COURT:  Yes.

8           MR. GILLIS:  The e-mails.

9           THE COURT:  I know this spills a little bit

10 over into whether the coconspirator statements come in,

11 but it all seems to merge together at some point.

12          MR. GILLIS:  In Government's Exhibit 8 --

13 beginning with Government Exhibit 8, if you have them,

14 Your Honor --

15          THE COURT:  I do.

16          MR. GILLIS:  -- in the second-to-last

17 sentence, he says --

18          THE COURT:  This is the memo on July 27.

19          MR. GILLIS:  His e-mail, yes, from July 27.

20          THE COURT:  Right.

21          MR. GILLIS:  He tells Alptekin:  I will

22 include our partners in the communications at the right

23 time.

24          Then in Exhibit 9 in the "PS" to the e-mail

25 of July 29 -- this is Alptekin telling Bijan Kian:

1  Needless to tell you, but he asked me not to read in

2  anyone else for the time being and keep this

3  confidential.

4           In Government's Exhibit 10, inferentially,

5  Your Honor, as I'll say later -- in Government's

6  Exhibit 10 where he lays out the design of this

7  project, which is called truth in Government

8  Exhibit 10, which is the initial -- he lays out there

9  but he does not include anyone else in that e-mail as

10 he had been requested by the highest officials in the

11 Turkish government.

12          Again, in Government Exhibit 11:  We will

13 need to bring in other specialists, which I will talk

14 to you about when we can Skype.

15          THE COURT:  This is all before the actual

16 retention; is that right?

17          MR. GILLIS:  This is leading up to --

18          THE COURT:  Right.

19          MR. GILLIS:  Yes.

20          THE COURT:  When was the date of the actual

21 retention as reflected in the contract between FIG

22 and --

23          MR. GILLIS:  In the Inovo agreement, Your

24 Honor?

25          THE COURT:  Yes.

1          MR. GILLIS:  There was the green light that

2 was provided by the Turkish government as communicated

3 by Alptekin to --

4          If I may have one moment.

5          Government Exhibit 14.  Your Honor, I had a

6 long -- this is Alptekin telling Flynn and Bijan Kian:

7 I had a long meeting with Turkish Official 2 -- I

8 believe it is -- upon the referral of Turkish

9 Official 1.  I explained what we can offer.  He agreed

10 to discuss in general lines at the council of ministers

11 today -- which, Your Honor, is effectively the same as

12 the cabinet -- and subsequently with Senior Turkish

13 Leader in more detail.

14          So this very project is being discussed at

15 the very highest levels, and it's being communicated

16 to --

17          THE COURT:  I'm looking at an August 25

18 e-mail that says, Thank you for informing us of your

19 decision to engage Flynn Intel Group for operation

20 confidence.

21          I take it that's when the formal retention

22 actually took place, somewhere right around there.

23          MR. GILLIS:  Yes, Your Honor, somewhere

24 around August -- well, August 10 is when the green

25 light came from -- to use Alptekin's words, the green

1  light to discuss confidentiality, budget, and the scope

2  of the contract.  That's August 10.

3             THE COURT:  Right.

4             MR. GILLIS:  The very next day, for the first

5  time, Kian, the defendant, brings in others from FIG

6  for the first time --

7             THE COURT:  Right.

8             MR. GILLIS:  -- and outlines what this

9  project is going to be.  If you compare Government's

10  Exhibit 18 to -- I believe it's Government's

11  Exhibit 10, they are virtually identical.

12             So what he was saying he was going to do for

13  the Turkish government under the truth project and what

14  he then said was going to be the confidence project,

15  those are basically -- I mean, they're virtually

16  identical.

17             THE COURT:  I understand.

18             MR. GILLIS:  So, Your Honor, there's also --

19  if the question, Your Honor, was what evidence is there

20  of the involvement of the government of Turkey in the

21  direction of the --

22             THE COURT:  Right, after the retention.

23             MR. GILLIS:  After the retention.  Your

24  Honor, there's at least two pieces of evidence that are

25  central to that.  One, there is, based upon prior

communications, that are inferentially -- necessarily
were made during the course of this so-called truth
project, there was an agreement to pay Alptekin
20 percent of this project.

        Because subsequently, once it became
supposedly the confidence project, in devising that,
Rafiekian expressly assured Alptekin, as he put it, I
did not touch your 20 percent.

        Alptekin then included that in the budget for
this project.  These payments were made by Alptekin
from his Turkish account, and then immediately
thereafter there was a payment back to Alptekin of
20 percent.

        THE COURT:  So the theory is that Alptekin
was essentially the factotum of the Turkish government.

        MR. GILLIS:  Exactly, Your Honor.  Not only
the theory, but we submit in totality the evidence
makes that point very strongly.

        THE COURT:  I understand.

        MR. GILLIS:  Would you like more?

        THE COURT:  Sure.

        MR. GILLIS:  Okay.  So, Your Honor, also,
there is an e-mail from Rafiekian to Flynn saying that
he was going to postdate the contract to August 15 or
thereabouts, a date after they allegedly created this

1  operation confidence, but he says right in there:  We

2  have been at work on this since July 15.

3         Which is during the course of this truth

4  project, when admittedly they were dealing with the

5  Turkish government directly.

6         Then there is a call that took place between

7  Flynn and Alptekin or rather -- yes, Flynn and Alptekin

8  in which they discussed a certain issue that had

9  arisen, and they believed that they had resolved it.

10 And Alptekin's response to Flynn was that he would take

11 it up with a senior Turkish official.  That then was

12 circulated to the FIG team, including the defendant.

13        So there's this suppression of evidence, Your

14 Honor, that the Turkish government was involved in

15 this, admittedly based upon statements that they made

16 to their attorneys.  But admittedly from early in July

17 through the time that this contract and beyond

18 obviously -- but through the time that this contract,

19 supposedly with Inovo and supposedly called now

20 operation confidence, there was this long history of

21 the Turkish government being directly involved in the

22 direction of the project.

23        THE COURT:  Right.  There was some disclosure

24 of that, is that right, in the FARA agreement?  There

25 was some disclosure of some involvement at some level

1  by the Turkish government with respect to initially

2  contacting Inovo, the meeting in New York.

3          MR. GILLIS:  Yes.

4          THE COURT:  There were references to the

5  Turkish government participating in some level and

6  benefiting in possibly some way; is that right?

7          MR. GILLIS:  May I have a moment, Your Honor?

8      (Counsel confer.)

9          MR. GILLIS:  Your Honor, those statements

10  themselves are false, but more importantly, they were

11  made basically after the jig was up insofar as the --

12          THE COURT:  They're in the FARA filing that

13  you contend was --

14          MR. GILLIS:  Yes, Your Honor.

15          THE COURT:  -- the object of the conspiracy.

16          MR. GILLIS:  Yes, Your Honor.  And by that

17  time, they had to make certain explanations for why the

18  Turkish government appeared to have some relationship

19  to the project.  Basically, though, they continued to

20  maintain that the client was --

21          THE COURT:  Inovo.

22          MR. GILLIS:  Inovo.  Thank you.

23          They denied that the Turkish government was

24  involved as a principal.  They claimed that the

25  high-level cabinet level meeting that took place in New

1  York, in which Rafiekian described as relating to

2  confidence, they denied that that meeting related to

3  the confidence project. So they claimed that this New

4  York meeting had nothing to do with it.

5             So there are a number of false statements

6  that were made in the FARA filing, but fundamental to

7  those were, one, that the Turkish government was not

8  involved; and, two, that Inovo was the true client.

9             THE COURT: All right.

10            MR. GILLIS: There also, Your Honor, is --

11  it's a point that just left my head, Your Honor.

12            THE COURT: I'm sure it will come back to

13  you.

14            MR. GILLIS: It may after I leave, I'm sure.

15            Do you have any further questions as to those

16  two motions?

17            THE COURT: I don't.

18            MR. GILLIS: Thank you, Your Honor.

19            THE COURT: Mr. Turgeon.

20            MR. TURGEON: Thank you, Your Honor.

21            I apologize for the back and forth. That's

22  how we divided the responses here.

23            THE COURT: No problem.

24            MR. TURGEON: I wanted to respond first to

25  Your Honor's question about the legal commercial

1  transaction.  Although we only received the defense's

2  motion, I think, less than -- I believe less than 48

3  hours ago and our responses --

4         THE COURT:  It was filed on the 6th.

5         MR. TURGEON:  It was on the 6th.  Well, I

6  apologize, Your Honor.

7         Our response is in any event still in --

8         THE COURT:  I understand.

9         MR. TURGEON:  With regard to the legal

10 commercial transaction and their vagueness challenge to

11 Section 951, two points:  First, that depends entirely

12 on a finding that the legal commercial transaction

13 aspect is an essential element to the offense, and it

14 is not.

15        THE COURT:  As opposed to a defense; is that

16 what you're saying?

17        MR. TURGEON:  Yes, Your Honor, an affirmative

18 defense or a definition.

19        THE COURT:  All right.

20        MR. TURGEON:  And it is not, and there's

21 court of appeals precedent for that.

22        Moreover, I would note -- and we're going to

23 explain this more fully.  But there was no transaction

24 in this case.  Transaction implies a defined scope.

25 This wasn't, you know, someone hiring a company to fix

1  the roof of the Turkish embassy or something.

2          THE COURT:  Well, they were hired.  As I

3  understand it, they engaged in lobbying and then

4  Flynn's op-ed.

5          MR. TURGEON:  Yes, Your Honor, but look at

6  the terms of the engagement.  It was open-ended, and it

7  was vague.  We know from the evidence in this case and

8  the documents we've submitted that the requirements

9  changed over time.  So that's -- that's why, Your

10 Honor, when someone hires a law firm -- when a foreign

11 government hires a law firm, Your Honor, that law firm

12 either provides notice to the attorney general under

13 Section 951 or registers under FARA.  So that's a

14 preview of that argument.

15          I also wanted to respond to Your Honor's

16 question of communications not being privileged in the

17 first place.  Of course, I briefed things out, our full

18 arguments.  Your Honor, it doesn't matter whether

19 Covington had decided to file a FARA registration or

20 not at the time the defendant was interviewed.  That's

21 because, as the defendant knew, Covington was retained

22 to respond to the DOJ's inquiry.

23          Now, whether that response came in the form

24 of a FARA registration or a letter to DOJ explaining

25 why no registration was necessary and laying out the

1  facts, the defendant knew that the information he

2  communicated to FIG's attorneys was going to be

3  transmitted to DOJ.  In fact, the Covington declaration

4  states that the defendant was specifically informed of

5  that fact.

6          Now, with regard to the FARA registration and

7  whether that waived privilege, in addition to what

8  Mr. Gillis said on that, the defense claims that there

9  was no waiver because some of the false statements

10  alleged in the indictment they say were not included in

11  the FARA filing.  Even if that were true -- and it's

12  not -- that wouldn't be helpful to the defense.

13          That's because the Fourth Circuit has held --

14  and I'm quoting -- waiver is not limited to the precise

15  information disclosed but includes all materials on the

16  same subject as those provided to the government.  And

17  that's from the *Martin Marietta* case.  Even the cases

18  cited by the defense say as much.

19          Moreover, those false statements were, in

20  fact, incorporated into the FARA filing.  The

21  government alleges material omissions, and the

22  defendant's misrepresentations caused material

23  omissions.  They prevented Covington from accurately

24  describing the scope of the project and the involvement

25  of Turkish government officials in it.

1          Finally, you know, I have to note the
2    defense's motion to suppress is much broader than those
3    five false statements listed in the indictment.
4    They've moved to suppress everything that the defendant
5    told FIG's lawyers.  So I don't know why we're focused
6    on those specific statements alone.

7          Your Honor hasn't asked about whether General
8    Flynn had the ability to waive FIG's privilege, but,
9    you know, I will say that the defense does make a big
10   deal of the fact that General Flynn was cooperating
11   with the government.  But what difference does that
12   make?  He still had a fiduciary duty to the company.

13         The defense wants the Court to disregard that
14   fact and to create some new privilege law.  They want
15   the Court to find that anytime a corporate officer
16   begins cooperating with the government, the officer is
17   presumed, as a matter of law, to be incapable of acting
18   in the corporation's best interest.  Of course, they
19   provide no cites for that argument because that's not
20   the law.

21         I mean, here's a hypothetical:  A company's
22   CEO learns there's an investigation of the company
23   regarding false statements in one of the company's
24   filings.  As CEO, he has a fiduciary duty to the
25   company.  So what should he do?  What would be in the

1  company's best interest?  The obvious answer is that

2  the CEO should protect the company by waiving the

3  privilege and allowing the wrongdoer to be identified

4  and prosecuted.

5         Under the new rule the defense would have

6  this Court fashion, the CEO has not duty to -- doesn't

7  have a duty to the company.  He has a duty to the

8  wrongdoer.  The defense thinks the CEO should let the

9  wrongdoer hide behind the company's privilege and allow

10  the company to be prosecuted instead.  That can't be

11  the law.  There is no fiduciary duty to engage in a

12  cover-up.

13         So if we're assuming that General Flynn

14  waived FIG's privilege, as the defense suggests, it's

15  clear that doing so was in FIG's best interest.  He was

16  trying to clear the company, and the company is the

17  only entity to which he had a duty.  And it turns out,

18  it looks like he was successful in doing so because the

19  company wasn't prosecuted.

20         Unless Your Honor has anything else?

21         THE COURT:  All right.  Thank you.

22         Ms. Mitchell.

23         MS. MITCHELL:  Yes, Your Honor.  Good

24  morning, Your Honor.

25         THE COURT:  Good morning.

1            MS. MITCHELL:  Much as the government has
2    divvied up the arguments, so have we.
3            THE COURT:  That's fine.
4            MS. MITCHELL:  I had intended to handle the
5    crime-fraud motion while Mr. MacDougall had intended to
6    handle and will handle the suppression aspect.
7            THE COURT:  That's fine.
8            MS. MITCHELL:  To the extent that Your Honor
9    wants to probe it further, Mr. Bereston was going to
10   handle the coconspirator's statement.
11           THE COURT:  That's fine.
12           MS. MITCHELL:  Thank you, Your Honor.
13           So, Your Honor, I won't sort of make my
14   argument straightforward as I had set it out.  You've
15   asked a number of questions, and I'm going to do my
16   best to focus in on those.  I believe Your Honor has
17   hit really on the key issues.
18           The first, of course, is the argument that we
19   make that the crime-fraud motion must be denied
20   because, in fact, this is opinion work product that
21   they seek to obtain.  This circuit is quite clear that
22   if you are looking at and working from oral statements
23   from a particular individual speaking to his attorneys
24   and the attorneys that are going to be then repeating
25   those or looking at their notes or memoranda of

1 witnesses, those necessarily reveal the thought

2 processes of those attorneys:  Taking notes, what they

3 write down, how they write it down, when they write it

4 down, what they go back to, what they didn't write

5 down.

6         So as in this standard, as Your Honor clearly

7 identifies, in order to meet the production to get the

8 waiver, the government has to show that the attorneys

9 from Covington or Ms. Verderame were involved in this.

10 They concede at the outset that they are not and thus

11 really the inquiry should stop here, Your Honor.

12         THE COURT:  Well, Mr. Gillis says that the

13 conversations didn't take place in the required context

14 for the purposes of the opinion work product privilege

15 in the first instance.

16         MS. MITCHELL:  We disagree with that, Your

17 Honor.  I can't imagine a circumstance in which I think

18 I am in contemplation of litigation more than when I

19 have received a letter from the Department of Justice,

20 the nation's litigator, on whether or not I have

21 complied with the law.

22         THE COURT:  All right.

23         MS. MITCHELL:  As a representative of a

24 company that's being inquired, I can't imagine a

25 circumstance in which the contemplation of litigation

1    is more focused in advance of the actual filing of the

2    litigation.

3            So we're happy to further brief that, but I

4    think it absolutely does fall squarely within that.

5            THE COURT:  All right.

6            MS. MITCHELL:  If we turn, Your Honor,

7    however, to the standard test, first, the government

8    says you don't need to really think very much because

9    you can just look at the indictment in this case.  In

10   fact, Mr. Gillis called it compelling and unreviewable.

11   I would suggest that's circular.  The indictment itself

12   contains the very statements that we are discussing

13   here today, and this is just -- it is -- as I said, it

14   is circular.

15           First, Your Honor, this logic would eliminate

16   the attorney-client privilege in basically every case.

17   In fact, a case cited in our brief, the *Stewart* matter,

18   addresses the same issue, and that case specifically

19   raises the question of a false statement where

20   defendants are accused of making a false statement to a

21   government agency.  Every time in which that happens,

22   there would be a loss of protection of the

23   attorney-client privilege if those statements are

24   previously made to a lawyer on the same subject matter.

25           Your Honor, as I indicated, these various

1    statements are in the indictment at page 5.  At least

2    some handful of them are set out -- sorry, I don't have

3    the paragraph -- paragraph 53.  The government confirms

4    in its brief that the violations found by the grand

5    jury are based on several false statements and

6    omissions that the defendant and Alptekin made to

7    Covington & Burling and Verderame for inclusion in the

8    filing.

9              So, again, as I said, Your Honor, this is

10   quite circular.

11             Looking beyond that point, the government

12   cannot meet the first prong of this test.  First of

13   all, Your Honor, the defendant was not engaged in or

14   planning a criminal or fraudulent scheme.  As Your

15   Honor quite appropriately pointed out, these

16   communications were made in January and March of 2017,

17   but even by the indictment's own face, there's no

18   conduct with respect to this after November 2016.  FIG

19   no longer was performing any work under the Inovo

20   engagement.  That officially ended even by its own

21   terms on November 15.

22             As I indicated, the indictment really has no

23   allegation with respect to any actions by anyone after

24   November 8 that was published.

25             THE COURT:  Well, the allegation is that the

1   conspiracy was for the purposes of concealing the

2   involvement of the Turkish government and the false

3   statements to the lawyers for the purposes of filing a

4   fraudulent or a false FARA statement was part of that

5   conspiracy in furtherance of the conspiracy to hide the

6   involvement of the Turkish government.

7           While I understand that the actual conduct

8   ended in the fall, why under the government's theory

9   wouldn't this conspiracy extend into the spring?

10          MS. MITCHELL:  For the very point you were

11  asking the questions of the government, which is what

12  evidence do they have following --

13          THE COURT:  That's a different issue.

14          MS. MITCHELL:  Yes.  But as you pointed out,

15  it is directly related.  We would suggest and submit to

16  the Court that following -- I don't think anybody would

17  argue from our side that, yes, initially, our client

18  absolutely wanted the government of Turkey to be his

19  client.  That would have been fabulous.  As it turned

20  out, that didn't happen, and he was retained by Inovo

21  to do work.

22          And so, other than sort of argument and

23  conclusions, there really is no evidence that there was

24  any scheme.  In fact, Your Honor, the one thing that is

25  notably missing from the indictment and from the

1  conversation here today is that our client, shortly

2  after entering into this contract, sought the advice of

3  an attorney on this very point saying -- going to the

4  attorney and saying, We need to file a FARA.  We need

5  to file this statement.

6              And he was told otherwise.

7              So, Your Honor, there's never been -- there's

8  no evidence of a conspiracy, and to the extent that

9  there is any evidence that postdates that, it's quite

10 to the contrary.

11             Your Honor, with respect to the conspiracy

12 and particularly the conspiracy to make false

13 statements under FARA, the government has not met its

14 burden additionally.

15             First of all, the contents of this were

16 determined not only by Mr. Rafiekian and Mr. Flynn but

17 their attorneys.  The government, again, concedes that

18 their attorneys are not part of a conspiracy.  They do

19 have some allegations that there was sort of parallel

20 conduct, if you will, of Mr. Alptekin in the context

21 that he provided information to the Covington

22 attorneys, but they have no evidence to show that there

23 was any agreement between them, any coordination

24 between them.  Again, it's speculation going back to

25 sort of drawing on information that they have from July

1    of the year prior.

2         I would also add, Your Honor, there's no

3    evidence to suggest that Mr. Alptekin's statements were

4    considered and/or used in the FARA statement.

5         And with respect to the FARA filing, Your

6    Honor, there really -- there is no showing that the

7    FARA filing contains any false statements or material

8    omissions.  Rather, as we explain at some length in our

9    opposition -- and I'm happy to go through them.

10        THE COURT:  You did in your briefing.

11        MS. MITCHELL:  Yes.  Right, and I don't need

12   to do it here.

13        But, Your Honor, the statements in there are

14   cherry-picked from an entire filing, as the Court just

15   identified, and was discussing with the government.

16   They are stripped of their important context.  One

17   example, of course, is that at paragraph 62 of the

18   indictment, the government alleges that FIG understood

19   the engagement to be focused on improving U.S. business

20   organizations' confidence regarding doing business in

21   Turkey, particularly with respect to the stability of

22   Turkey and its suitability as a venue for investment

23   and commercial activity.

24        The government doesn't tell us why they

25   believe that statement is false or the material facts

1   which may be omitted.  But reading the entire

2   indictment, one can posit that it's based on the

3   government's view that the purpose of the engagement,

4   which they describe in the indictment at paragraph 3,

5   is that they contend that it was to influence U.S.

6   politicians and public opinion concerning a Turkish

7   citizen living in the United States whose extradition

8   was being sought by the government of Turkey.

9           However -- and I think Your Honor just

10  pointed to this precise example -- a complete reading

11  of the filing reveals that FIG was actually quite

12  transparent about this.  In fact, in the very next

13  paragraph, which, of course, is in the filing but not

14  in the indictment, FIG expressly disclosed that work --

15  under the contract pertaining to Mr. Gulen --

16  specifically, they stated, Under the contract Flynn

17  Intel Group conducted open-source research for Inovo at

18  Inovo's direction.  The research was conducted by

19  independent contractors retained for this purpose,

20  focused on Mr. Fethullah Gulen and charter schools in

21  the United States that are associated with or allegedly

22  associated with Mr. Gulen.

23          As we've done in the motion, Your Honor,

24  we've gone over time and again where the government has

25  cherry-picked and left important information outside

1  the scope of its indictment -- of the four corners of

2  the indictment.

3          Your Honor, one additional point.  Mr. Gillis

4  alleged that the FARA filing said that Turkey was not

5  involved.  Actually, the filing did not say that Turkey

6  was not involved.  What it said was they didn't know

7  whether and the extent to which Turkey was involved in

8  FIG's retention by Inovo.  So, again, it's a failure to

9  look at that filing and to be careful about looking at

10 that filing and what it says.

11         THE COURT:  Right.

12         MS. MITCHELL:  It's premised on this

13 speculation or argument about what happened six, eight

14 months before it and sort of an unwillingness to

15 acknowledge that a business deal that our client and

16 Mr. Alptekin hoped to get with the government of Turkey

17 didn't come through and an unwillingness to

18 acknowledge, as is set forth in a number of pieces of

19 evidence that the government has, including

20 Mr. Kelley's affidavit, as well as the FARA filing

21 itself, that instead, Inovo retained Flynn Intel Group.

22         Anything additional Your Honor would like to

23 hear on this point?

24         THE COURT:  No.

25         MS. MITCHELL:  All right.  I will turn it

1  over to Mr. MacDougall.

2          THE COURT:  All right.

3          MR. TROUT:  Your Honor, may I?

4          THE COURT:  Yes.

5      (Counsel confer.)

6          MS. MITCHELL:  I am being appropriately

7  corrected.  The FARA filing does explicitly include a

8  reference to the Arent Fox letter.  So I misspoke

9  there.

10          THE COURT:  All right.  Mr. MacDougall.

11          MR. MACDOUGALL:  Thank you, Your Honor.  I

12  know we're kind of going in reverse and the government

13  has already articulated its opposition.  I'd like to

14  briefly address the motion to suppress and to dismiss,

15  subparagraph B of Count 1 of the indictment.

16          Your Honor, we're relying on the exclusionary

17  rule here and the Fourth and Fifth Amendment rights

18  that this client, this defendant has as the case goes

19  forward.  There's been much talk about --

20          THE COURT:  That really rises or falls with

21  the government's motions for crime fraud or

22  communications for the purposes of public filing;

23  doesn't it?

24          MR. MACDOUGALL:  Well, it does, Your Honor,

25  but I think the distinction here is that -- and as the

1  Court has seen this, I'm sure, hundreds of times, the
2  crime-fraud exception is almost always brought during
3  the investigative stage.  It's almost always sought
4  when the case is under investigation and done through
5  evidentiary proceedings.  Here it didn't happen that
6  way, and the government is trying to fix that up on the
7  eve of trial.  And the reason that's important, Your
8  Honor, I believe, and I think the evidence will
9  ultimately show, is this wasn't a waiver.  There was no
10  waiver of the privilege.  There was a breach.  It was
11  taken, and it was taken through a series of events I'd
12  like to briefly articulate.  But in taking the value of
13  that opinion and work product and then incorporating it
14  into the indictment, the government essentially
15  achieved what it should have sought but didn't with the
16  grand jury and with grand jury evidence and with a
17  crime-fraud order.
18        Your Honor, the Court has heard at pretrial
19  hearings a great deal of talk about what the evidence
20  will show and what the facts are.  There's a few things
21  that are not in dispute at this stage.  I'd like to
22  touch on those because I think they take us right to
23  the point of what really happened here with the
24  privilege and why any introduction of it at trial
25  should be precluded.  The first is the engagement

1   letters.  There were two of them signed.

2          THE COURT:  Let me ask this, and I think this

3   is what you're suggesting.  Let's assume there was no

4   valid waiver and there was a breach of the privilege in

5   the first instance.  Is it your position that the

6   crime-fraud exception doesn't save that taint that

7   would otherwise attach from the invalid waiver, or is

8   it your view, which I assume is the government's view,

9   that if they were covered by the crime fraud, there was

10  no privilege in the first place and, therefore, you

11  didn't need a waiver -- you didn't need a court

12  determination that there was a crime-fraud exception?

13         MR. MACDOUGALL:  Your Honor, I would -- my

14  response would be that the constitutional protections

15  that we're relying on here and that the right to be

16  free of unlawful searches and seizure, would trump any

17  crime-fraud doctrine or any application of the

18  crime-fraud exception.  The harm was done, and then the

19  fruit of that harm was brought into the indictment made

20  public, and now the government at the very last stage

21  is trying to recoup that.

22         Your Honor, I think the answer is that you

23  can't overcome a constitutional failure like that, a

24  constitutional violation.  That opinion work product

25  and all that flows from it is tainted.  It's the

1 poisonous tree, and I believe it's out of the case,

2 Your Honor, under applicable law.

3          If I may, Your Honor, with regard to the

4 sequence of events.

5          THE COURT: Yes.

6          MR. MACDOUGALL: January 9, 2017, two

7 engagement letters are signed by Covington, one with

8 General Flynn and one with Flynn Intel Group.

9          THE COURT: What was the date?

10          MR. MACDOUGALL: January 9, 2017, Your Honor.

11          THE COURT: They had consulted before that;

12 hadn't they?

13          MR. MACDOUGALL: I believe so, Your Honor.

14 Yes, I believe that's right.

15          But the engagement letter from Flynn Intel

16 Group has an important provision. It says if a

17 conflict arises between Mr. Flynn and the corporation,

18 the corporation gets another lawyer. It's a reasonable

19 provision. I see it all the time. They thought about

20 that at the beginning. A year goes by. December 1

21 Mr. Flynn pleads, and he pleads to a one-count criminal

22 information. What we're going to see here, Your Honor,

23 is a series of --

24          THE COURT: When was that?

25          MR. MACDOUGALL: December 1, 2017, he pleads

1   in the District of Columbia.

2          What we're going to see, Your Honor, in each

3   of these instances, is conduct and activity that

4   doesn't make sense unless you begin to look at it

5   through the lens of an effort to invade the

6   attorney-client privilege.

7          Because when you look at the information that

8   was filed, that Mr. Flynn pled to, there's not a

9   whisper of Turkey.  It's about his statements to -- his

10  involvement and his statements with the Russian

11  ambassador and the false statements he made after that.

12  There's not a word of it in the information.

13         But you go to the statement of facts, and the

14  Court has seen thousands of them.  They are intended to

15  articulate the elements of the offense to which the

16  defendant is pleading, and that's it.  But tacked on to

17  the end of that, the Court will find paragraph 5 that

18  describes in general terms the government's theory of

19  the Turkey allegation.

20         It doesn't make any sense.  Everyone has

21  admitted that General Flynn made other false

22  statements.  There's all kinds of things, and the

23  typical defendant coming in has told the government

24  about a whole range of bad conduct and offenses.  But

25  the statement of facts that supports the information is

1    confined to the elements of the offense.  It raises the

2    question:  Why is this Turkish story added on the end?

3    I think the answer emerges.

4            But on December 1, when that plea is entered,

5    another unusual event takes place, and that is that

6    Covington doesn't leave.  Covington doesn't look back

7    at its engagement letter and say, conflict of interest.

8    We're out.  The reason that that's so important is they

9    have incorporated into that statement of facts the

10   Turkey investigation.  The Turkey investigation is

11   there.  There's no question.  Textbook conflict of

12   interest between the corporation to which Mr. Turgeon

13   described Mr. Flynn having a fiduciary duty and

14   Mr. Flynn himself.  They have to get out, but they

15   don't.

16           THE COURT:  Do we have as an exhibit

17   somewhere Flynn's statement of facts?

18           MR. MACDOUGALL:  I don't know that, Your

19   Honor, but we can certainly file that with the Court.

20           THE COURT:  All right.

21           MR. MACDOUGALL:  So on December 1, Mr. Flynn

22   and the Flynn Intel Group are unquestionably adverse

23   and Covington continues to work on -- I'll echo what

24   Mr. Gillis said.  I cast no aspersions on Covington or

25   the lawyers.  I think they were acting in what they

1   perceived to be a zealous approach to defending

2   Mr. Flynn, but the facts are the facts.

3          What's also not in dispute is that -- and we

4   have raised it multiple times, and we have heard no

5   explanation from the government or Covington or

6   Ms. Verderame or anyone else.  March 25 a false

7   declaration is prepared and signed by Mr. Flynn.  Now,

8   Mr. Turgeon was noting Mr. Flynn's fiduciary duty to

9   the corporation.  Signing a false declaration that says

10  a shareholders meeting took place when none took place,

11  that says a board meeting took place when none took

12  place, and then filing it with the Delaware secretary

13  of state to dissolve the corporation, if there is not a

14  casebook breach of fiduciary duty, I don't know what

15  that is.

16          THE COURT:  That was March 25?

17          MR. MACDOUGALL:  Yes, Your Honor.

18          THE COURT:  When was the FARA filing?  The

19  17th?

20          MR. MACDOUGALL:  I believe that's right, Your

21  Honor.  Yes, the 17th.

22          MS. MITCHELL:  The 7th.

23          MR. MACDOUGALL:  Sorry, Your Honor, March 7,

24  2017.

25          THE COURT:  March 7.

1              MR. MACDOUGALL:   The declaration is signed
2  the 25th.  It's signed.  It's filed April 10, 2018,
3  filed with the secretary of state.
4              No one --
5              THE COURT:  The dissolution occurred a year
6  later basically?
7              MR. MACDOUGALL:  That's right.
8              THE COURT:  Okay.
9              MR. MACDOUGALL:  The only -- the consequence
10 of the dissolution is it cuts off Mr. Rafiekian's
11 rights as a shareholder and a director.  He can't say
12 to Mr. Flynn and his lawyers:  I need to have a board
13 meeting.  I need to know what's going on here.  I still
14 have a corporation.
15             By dissolution -- by filing the dissolution,
16 fraudulent though it may be, Covington's position and
17 subsequently the government's position is he's cut off.
18 He's got no more rights.  He's gone.  Then a hopelessly
19 conflicted Mr. Flynn begins to call the shots with
20 regard to the attorney-client privilege and the opinion
21 work product.
22             And that process continues into June 2018.
23 We go onto the filing April 10.  The document is
24 prepared March 25.  June 2018 -- the Court has seen
25 this in the filings -- e-mails from Mr. Kelner to

```
 1  Mr. Flynn now identifying the prosecutor by a first
 2  name who is handling the case against Bijan.  He says
 3  the bottom line is the EDVA prosecutors are asking that
 4  FIG, Flynn Intel Group, waive the privilege.  A week
 5  later, again, without any notice to Mr. Rafiekian or
 6  his lawyers, the waiver letter issued by Covington goes
 7  to the government that begins, Our client, the Flynn
 8  Intel Group.
 9          A corporation that has been dissolved, a
10  corporation that they asserted at the beginning of
11  their representation, if it became adverse, they would
12  get out, is still their client.  From that flows the
13  disclosure.  Your Honor, I submit from that flows the
14  breach.  They had no right to do that.  They should not
15  have been representing that corporation, but the reason
16  they continued was that if they called another lawyer
17  in, the other lawyer would say, Wait a minute.  I don't
18  have a duty to Mr. Flynn.  My duty is to the
19  corporation.
20          The consequence might have been quite
21  different.
22          The same explanation can only support the
23  filing of the false declaration.  Let's cut off
24  Mr. Rafiekian.  There's a case against Bijan.  Let's
25  segregate him, and let's give the government what it
```

1  wants because, ultimately, it's the government that

2  controls Mr. Flynn's sentencing, whether he gets his

3  5K1 and whether he's ultimately incarcerated.

4           No crime-fraud exception, as the Court has

5  noted, during the investigation, and that is almost

6  always the case.  It's rarely brought at this stage,

7  late in a proceeding.

8           So, Your Honor, what really happened here,

9  and why should all of this evidence be suppressed and

10 paragraph B of Count 1 struck from the indictment,

11 dismissed?

12          Flynn Intel Group had valuable rights to

13 protect.  There's no question about that.  This Court

14 has heard from half a dozen groups of lawyers talking

15 about the efficacy of that.  Mr. Flynn became a

16 government agent.  He was interviewed 20 times.

17 There's 20 302s.  This is public.  He became the most

18 aggressive, active, energetic government agent

19 cooperating witness that probably anyone has ever seen.

20          The purpose was to obtain control of the

21 privilege.  To do that, a false declaration that no one

22 has even tried to explain, signed by Mr. Flynn,

23 prepared by his lawyers is filed in Delaware, the

24 consequence of which is we don't have to talk to

25 Mr. Rafiekian anymore.  He's off the table.  This is a

1  contortion of the law, Your Honor.  Covington and

2  Mr. Flynn violated the privilege.  They want to dress

3  it up as a waiver now very late in the game.

4          Either Mr. Gillis or Mr. Turgeon offered a

5  hypothetical, Your Honor.  If I may, Your Honor, in

6  conclusion, here's a hypothetical that really matches

7  this conclusion, this set of facts.  The government has

8  a cooperating witness who is an employee, maybe a

9  senior employee of a corporation.  He says, I would

10 really like to have a look at the legal file in the

11 corporation's office.  Do you know where the key is?

12         The cooperating witness says, Yeah, actually,

13 I do.

14         His lawyer drives him to the office one

15 night.  Nobody is around.  He goes in.  He gets it, and

16 he gives it to the government.

17         There's no factual distinction here.  Now,

18 the government may say the distinction is he committed

19 a crime.  He broke in.  The crime was committed here,

20 Your Honor, in the State of Delaware.  Nobody doubts

21 that.  Nobody has even challenged that.  That's what

22 happened here, a taking, Your Honor, a taking, a breach

23 dressed up as a waiver.  It wasn't a waiver, and it was

24 unlawful, Your Honor.  The Court should recognize that

25 by suppressing that evidence in its entirety at trial.

1              Thank you, Your Honor.

2              THE COURT:  All right.  I think we have one

3    more from your side.

4              MS. MITCHELL:  I'm not sure, Your Honor.  Are

5    you going to hear additional argument with respect to

6    the coconspirator statement separately, or do you want

7    that addressed here?

8              THE COURT:  Let me hear it now.

9              MS. MITCHELL:  Mr. Bereston.

10             MR. BERESTON:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. BERESTON:  Your Honor, before the

13   government can introduce out-of-court statements by

14   alleged coconspirators, it needs to establish by a

15   preponderance of the evidence the existence of the

16   conspiracy and that those statements were made during

17   and in furtherance of the conspiracy.  The government

18   simply failed to meet that burden here for any of the

19   out-of-court statements referenced in the indictment

20   for any of the alleged coconspirators.

21             The scope of the conspiracy here is critical

22   to the Court's analysis of this issue.  Let's start

23   with Count 1A, which is the conspiracy to violate

24   Section 951.  Mr. Rafiekian is not charged with

25   conspiring to act as an agent of a foreign government.

1   He's charged with conspiring to act as an agent without

2   prior notification to the attorney general, and that's

3   the key language here, Your Honor.

4          The touchtone of any conspiracy analysis is

5   when there was an agreement between two or more persons

6   to commit an illegal act.  So the salient question here

7   becomes, has the government established by a

8   preponderance of the evidence that there was an

9   agreement between Mr. Rafiekian and anyone else not to

10  notify the attorney general to the extent Turkey was

11  even involved in the project?  There's simply no

12  evidence of an agreement here.

13         To be sure, Your Honor, Mr. Rafiekian did not

14  act as an agent of a foreign government.  Flynn Intel

15  Group contracted with Inovo, which is a private

16  company.  It's owned by a private business man, the

17  codefendant in this case.  The government makes only

18  conclusory allegations that fail to establish an agency

19  relationship between the Flynn Intel Group and the

20  Turkish government.

21         In any event, Your Honor, such actions would

22  not standing alone be a crime.  It's not a crime to act

23  as an agent of a foreign government.  Indeed,

24  Section 951 itself lists a number of instances in which

25  you can act as an agent of a foreign government.  For

1  instance, if you -- if they're engaged in a legal

2  commercial transaction, if you're an official diplomat.

3  It's only a crime to do so without prior notification

4  to the attorney general.  That's the crime that's

5  charged here.

6           So to meet its burden in this case by a

7  preponderance of the evidence, the government needs to

8  put forth evidence that Mr. Rafiekian agreed with the

9  coconspirators to deprive the attorney general of

10 notification.  The government has failed to do so here.

11          The allegations made by the government in its

12 briefing have absolutely --

13          THE COURT:  Go back a minute.  You say that

14 it's not a crime if you're engaged in a legal

15 commercial transaction so long as you provide

16 notification.  Are you saying that you still need to

17 provide notification?

18          MR. BERESTON:  I don't believe that that's

19 the case under Section 951.

20          THE COURT:  All right.

21          MR. BERESTON:  That's a --

22          THE COURT:  I misheard you then.

23          MR. BERESTON:  Yeah.  It's sort of a separate

24 instance in which you can be acting as an agent of a

25 foreign government as provided by 951, Section 951.

1           THE COURT:  All right.

2           MR. BERESTON:  The allegations made by the

3   government's briefing have absolutely nothing to do

4   with any effort to hide Turkey's involvement.  Instead,

5   we've submitted evidence showing that FIG's initial

6   failure to register with the attorney general was not

7   the object of any conspiracy but rather the result of

8   Mr. Rafiekian's conversations with FIG's legal counsel,

9   Bob Kelley.

10          As we've highlighted Your Honor, several

11  weeks after FIG began its work, Mr. Rafiekian contacted

12  Mr. Kelley for the specific purpose of registering

13  under FARA.  In fact, he said -- and I'm quoting, Your

14  Honor -- We have to register with FARA at the Justice

15  Department.

16          That's what he said to Mr. Kelley.

17  Mr. Kelley reviewed the work that the Flynn Intel Group

18  was doing for Inovo and said that, you know, FIG

19  doesn't need to file under the Foreign Agents

20  Registration Act.  It's sufficient if they file under

21  the Lobbying Disclosure Act.  Mr. Kelley prepared and

22  filed that LDA filing.

23          The government submitted no evidence to

24  suggest that either Mr. Alptekin or anyone in the

25  Turkish government was involved in that decision, Your

1  Honor.

2         I would like to now turn to Count 1B, which

3  alleges a conspiracy to make false statements in a FARA

4  filing.  Your Honor, we can quickly dispatch with any

5  argument that there was an agreement between the

6  defendant and any Turkish government official about

7  making false statements in a FARA filing.  The

8  government itself makes no mention in its briefing of

9  Turkish officials when discussing the FARA filing at

10  all.  It has pointed to no evidence that the Turkish

11  government was involved at all in this process.  As

12  such, any statements referencing -- any statements

13  related to Count 1B should be excluded from trial.

14         With respect to Mr. Alptekin, the

15  government -- in allegations that Mr. Rafiekian and

16  Mr. Alptekin separately made false statements to

17  individual attorneys with respect to FIG's FARA filing,

18  Your Honor, as we file it in our brief, allegations of

19  parallel conduct like these are insufficient to state a

20  claim for conspiracy.  The case on that, as we file it,

21  is *Bell Atlantic Corporation v. Twombly*.

22         Next, Your Honor, the Fourth Circuit has held

23  that evidence independent of the hearsay statements is

24  required to establish a conspiracy for the purpose of

25  the Rule 801.  Now, to be sure, the hearsay statements

1   themselves do not show agreement to fail to notify the

2   attorney general or to make false statements in a FARA

3   filing.  Even if they did, there's no independent

4   evidence here that establishes the conspiracy even when

5   taken together with the hearsay statements.

6          Even if we take as true the allegation -- the

7   independent evidence that the government has offered,

8   at most it shows that Turkey was aware of the work that

9   FIG was doing.  It doesn't show any agreement between

10  Mr. Rafiekian to hide Turkey's involvement in that work

11  or to make false statements in the FARA filing.

12         Lastly, Your Honor, we think this is an issue

13  that should be resolved before trial.  It's certainly

14  within the Court's discretion to do so.  We believe the

15  Court has all the information it needs to do so now.

16  The government has simply failed to establish the

17  existence of an agreement here.

18         Lastly, Your Honor, this case is unique.  The

19  indictment itself references upwards of 17 out-of-court

20  statements by coconspirators.  There are at least five

21  unindicted coconspirators whose statements the

22  government has indicated they plan to introduce at

23  trial.  We think that if we wait until trial to resolve

24  this issue, it's going to result in a significant

25  interruption to the trial itself and a significant

1  chance of prejudice to Mr. Rafiekian if these otherwise

2  inadmissible hearsay statements are heard by the jury.

3  We think it would avoid unfair surprise to

4  Mr. Rafiekian and allow him to adequately prepare his

5  defense.  We simply ask the Court's assistance in doing

6  so.

7          Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Page.

9          MR. PAGE:  Your Honor, Rodney Page together

10  with my colleague, Jennifer Kies.  We appreciate the

11  opportunity to appear especially for the limited

12  purpose of addressing the motion of the government to

13  apply the crime-fraud exception to communications of

14  Mr. Alptekin with Arent Fox.

15          In the interest of time, Your Honor, I don't

16  plan to duplicate what's been said.  I think, in large

17  part, the position of Mr. Alptekin is a subset of the

18  positions and issues raised with respect to the other

19  defendant.  You've heard that.  It's been briefed by

20  both parties.  I will try to address your specific

21  issues.

22          I think that the principal concern we have is

23  that the government is drawing with a very broad brush

24  here when it tries to apply the crime-fraud exception,

25  essentially relying on the indictment itself and the

1    fact of the indictment as justification for doing so.

2            As was said by one of the counsel earlier, if

3    that's basically the rule, then it means that the

4    attorney-client privilege may not exist.  If the

5    indictment itself can simply refer to statements of

6    lawyers who are not conspirators, who are not being

7    charged with anything, who are said by the government

8    to be totally innocent, if those statements alone then

9    open up the privilege, then there may be no privilege.

10           I want to call the Court's attention in

11   particular to a discrepancy, as I see it, in the logic

12   of the government, and I think it will address the

13   Court's earlier question about the Arent Fox opinion

14   letter and the waiver.  I think it also highlights how

15   the government, in our view, is being very imprecise,

16   if I can say that, about their approach to the

17   crime-fraud exception.

18           In the indictment -- it's in paragraph 54B --

19   it is alleged that there is a statement that our client

20   told Arent Fox that it had not been consulted on the

21   opinion piece that was published and that he would have

22   opposed it if asked.  But the motion from the

23   government actually characterizes it totally

24   differently.  The motion from the government says -- in

25   referring to why the crime-fraud exception should be

1   waived, it says, for example, FIG -- the FIG filing

2   said that Flynn had written the op-ed piece on his own

3   initiative and that the others were not consulted.

4   That's a different spin.  It's a different type of --

5   it's a different articulation with other types of

6   specifics and facts that would be involved.

7           In fact, what's referred to in the FARA

8   filing and what is the reference to the Arent Fox

9   letter has no reference at all to the authorship of the

10  op-ed piece.  It is on other subjects, which is who

11  Inovo is, what the nature of its business is, and

12  whether it had retained Flynn for a specific purpose.

13  There's not a single reference to the op-ed piece.

14          The government is actually not concerned, it

15  appears, with what the specifics are.  They just want a

16  blanket waiver of the attorney-client privilege.

17          Our position on this is that if there's any

18  justification at all to waive the privilege, it has to

19  be done on the basis of specific communications.  The

20  Court should be reviewing the specific questions that

21  are going to be asked.  Because in doing so, you might

22  be able to avoid the opinion work product problem,

23  which is inherent in the approach the government is

24  taking.

25          As was suggested earlier, this attempt to

1    waive the privilege -- to impose a waiver is being done

2    at an odd time in the case.  This is a situation where

3    normally, in the gathering of evidence, the government

4    would find a reason to ask for a waiver of the

5    crime-fraud exception.  At this point, they have plenty

6    of evidence.  They are on the eve of trial, and they

7    are going backwards.  They are doing it because they

8    don't want to address the specifics by simply asking

9    the Court to make a broad waiver.

10           Your Honor, our objection is that there is no

11   basis to do that on the indictment, that what the

12   government proposes when it tries to be specific about

13   what it's seeking is actually inconsistent.  We would

14   ask you to reject that approach, and if it's going to

15   go forward at all, do it on a

16   communication-by-communication basis.

17           THE COURT:  All right.  What about my

18   specific issue?

19           MR. PAGE:  So the specific is this, and I

20   alluded to this earlier.  The Arent Fox letter being

21   shared with Covington, we would contend, is simply an

22   ordinary sharing of information on a common privilege

23   basis.  What Covington then did was in effect quote

24   from or refer to specifics that go into the document

25   itself that was filed with FARA.  That's a much more

1    limited set of circumstances and set of facts.  It goes

2    to my point that the government's approach here is as

3    broad as possible.  They don't want to deal with

4    specifics.  So their approach is simply a blanket

5    waiver.

6              If the Court were inclined to go that way, it

7    would have to be a very limited application.  It would

8    have to be limited also as to what questions are being

9    asked, what communications are being referred to, and

10   there would have to be an examination of that context,

11   as well as what Covington said when it characterized

12   the Arent Fox material.

13             THE COURT:  All right.

14             MR. PAGE:  Thank you.

15             THE COURT:  Thank you.

16             Mr. Gillis, I'll give you an opportunity.

17   Also, if you could, respond more specifically to

18   anything else you want to say about the coconspirator

19   statements issue and the sufficiency of the evidence on

20   the existence of the conspiracy.

21             MR. GILLIS:  Yes, Your Honor.

22             THE COURT:  You've given the Court what

23   you're relying on for the, quote, independent evidence

24   with respect to the existence of the conspiracy that

25   would justify the coconspirator statements that you've

1  presented; is that right?

2          MR. GILLIS:  That's correct.

3          THE COURT:  We have it in the briefing and in

4  the indictment.

5          MR. GILLIS:  Yes, and in the exhibits that we

6  submitted, Your Honor.

7          THE COURT:  Right.

8          MR. GILLIS:  That --

9          THE COURT:  Let me ask you this.  It's not in

10  the indictment.  Is the government alleging that

11  Mr. Flynn was part of this conspiracy?

12          MR. GILLIS:  We are not, Your Honor.

13          THE COURT:  Right.  So you're not presenting

14  any statements by him, any testimony -- there would be

15  no evidence from him as to the existence of the

16  conspiracy?

17          MR. GILLIS:  Well, Your Honor -- no, Your

18  Honor, as to that.  There will certainly be testimony

19  from General Flynn.  And from that testimony, the jury

20  could draw a reasonable inference that there was a

21  conspiracy, but we are not -- we do not contend that

22  General Flynn was a part of that conspiracy.

23          THE COURT:  All right.

24          MR. GILLIS:  With respect to the Kelley

25  declaration, Your Honor, as far as what Ms. Mitchell

1   raised, our position as to that is that that's merely

2   another step in furtherance of the conspiracy.  When

3   asked a direct question by Mr. Kelley who the client

4   was, Rafiekian claimed that it was Inovo, a private

5   client.  That simply was untrue.  He knew it was untrue

6   at the time.  What advice Kelley provided at that time

7   was, therefore, inaccurate based upon what that advice

8   of counsel defense requires, which is a complete and

9   full breast of all of the facts involved in the case.

10  That certainly was not done here as the declaration

11  itself demonstrates.

12          With respect to the question of the

13  attorney-client privilege and the standard, it is

14  probable cause, Your Honor.  The facts that we have

15  shown, that we have argued, and that are in the

16  indictment certainly establish probable cause that

17  would be sufficient for obtaining a warrant.

18          So it is a standard, we submit, has been met.

19  Actually, as to that point, we do agree with counsel,

20  that the Court has the information it needs to make a

21  ruling with respect to the government having

22  established the existence of a conspiracy.  We'd submit

23  that the Court should rule that there has been

24  sufficient evidence presented in the form of the

25  independent evidence that we have supplied to the

1  Court.

2          I don't submit that the indictment itself

3  would suffice for that position.  Obviously, that's a

4  determination that could be made during trial.  But it

5  could also be made in advance of trial, and the

6  exhibits that we have submitted together with the

7  argument that we've made as to what the reasonable

8  inferences are as to that, we submit, would allow the

9  Court to make a determination now that indeed probable

10 cause as to the existence a conspiracy has been

11 established quite independent of the indictment.

12          I want to address briefly one thing.  I'm no

13 longer going to write e-mails addressed to Mark, Bob,

14 and Stacey.  I will tell you that.  It's all going to

15 be Mr. This or Mr. That because, apparently, that

16 indicates something nefarious about the communications

17 between Flynn's lawyers and the Covington lawyers.

18          If I may, Your Honor, the statements in

19 Flynn's statement of facts, the last paragraph,

20 paragraph 5, Mr. MacDougall characterized those as

21 having been tacked on.  Well, as the Court knows, it's

22 commonplace for additional facts to be included in the

23 statement of facts, not the least of which is because

24 it's relevant to sentencing and it is other relevant

25 conduct.  As well as that it is something that, I'm

1  sure, when he was a prosecutor, Mr. MacDougall would

2  have done in certain cases.  So it's not necessary that

3  the statement of facts be confined only to the facts

4  necessary to support the plea.  As I'm sure the Court

5  has seen, any number of statements of fact go beyond

6  that.

7            May I have one moment, Your Honor?

8            THE COURT:  Yes.

9            MR. GILLIS:  Your Honor, if you have any

10  further questions with respect to the establishment of

11  the attorney-client privilege or the crime-fraud

12  exception, I'd be happy to try and answer them.

13            THE COURT:  Let me just make sure I'm clear.

14  The government does not intend to present any evidence

15  and you are not asking the Court to consider any

16  evidence from Flynn that Flynn witnessed any agreement

17  between these alleged coconspirators to conceal the

18  involvement of the Turkish government; is that correct?

19            MR. GILLIS:  Your Honor, not necessarily.

20  What he is going to testify to would lead to a logical

21  inference of that, including the e-mails that he's

22  received and those that we have brought to the Court's

23  attention, as well as other testimony that he will

24  provide that will suggest that the government of Turkey

25  was involved.  He was aware of certain of the e-mails

1  that said, you know, Needless to say, we don't want to

2  mention who is behind this.

3          THE COURT:  Well, those are the e-mails

4  you've submitted.

5          MR. GILLIS:  Exactly, Your Honor.

6          With respect to the testimony, yes, his

7  testimony is going to go well beyond what is contained

8  in the documents that we've produced.  So I would not

9  want to limit myself to the notion that there won't be

10 any testimony from Mr. Flynn that -- or rather from

11 General Flynn that would say that he was not a witness

12 to instances that would suggest that they were

13 concealing this.

14         Obviously, as the statement of facts that

15 General Flynn agreed to, the FARA filing that

16 ultimately was made and is the subject of paragraph 5

17 of his statement of facts, he acknowledges the

18 involvement of the government of Turkey, among other

19 things, was not made in the FARA filing and that that

20 was false.

21         THE COURT:  All right.  In any event, you've

22 submitted in your exhibits and in the indictment what

23 you're presenting to the Court as the independent

24 evidence of the conspiracy?

25         MR. GILLIS:  Yes, Your Honor.

1          THE COURT:  All right.  Thank you.

2          Ms. Mitchell, I have a question for you.

3          MR. GILLIS:  I'm sorry.  I beg your pardon,

4  Your Honor.

5          THE COURT:  Yes.

6          MR. GILLIS:  Besides General Flynn,

7  obviously, we'd be calling witnesses to that as well,

8  that question of efforts to conceal -- that will infer

9  efforts to conceal.

10          THE COURT:  All right.  Ms. Mitchell, I have

11  a question just as a practical matter given your view

12  of the opinion work product issue.

13          MS. MITCHELL:  Yes.

14          THE COURT:  As a practical matter, absent the

15  involvement of the lawyers, how would you get any

16  evidence in of the statements that are not protected

17  under the crime-fraud exception?  You have to have

18  something written by the client himself?

19          MS. MITCHELL:  So a great example, Your

20  Honor, is contained --

21          THE COURT:  Because under your view, you

22  couldn't put the lawyer on and say, What did the client

23  say?

24          MS. MITCHELL:  Correct.  You could not put

25  the lawyer on and say, In the context of your speaking

1 with your client, what did that person say? Correct.

2 However, one of the cases that -- one of the In re

3 Grand Jury cases -- I believe it is *In re Grand Jury*

4 *Proceedings #5*, Fourth Circuit, 401 F.3d 247.

5 Although, it could also be the next one cited *In re*

6 *Grand Jury Subpoena*, 870 F.3d. What was sought in that

7 case, Your Honor, were answers to factual questions:

8 How, Mr. MacDougall, did you come into possession of a

9 document, the answer to which could have been, My

10 client gave it to me.

11          So facts known independently to the attorney

12 can certainly be admitted, but as far as the

13 interaction, as far as consulting with an attorney in

14 advance of making a filing, those would be protected if

15 they are contained in memoranda or other handwritten

16 notes.

17          THE COURT: All right.

18          MS. MITCHELL: Your Honor, one other point

19 Mr. MacDougall has asked me to follow up with.

20 Mr. Flynn's statement of facts is attached as an

21 exhibit to our motion to dismiss the indictment at

22 Exhibit C.

23          THE COURT: All right. Let me move on to

24 some of the others. With respect to Rafiekian's motion

25 for a jury questionnaire and peremptory challenges, I'm

1  going to continue to review that.  I'll tell you:  I'm

2  not inclined to do a jury questionnaire.  I think we

3  can make arrangements during the trial to have a

4  fulsome *voir dire*, and the Court will consider some

5  additional peremptory challenges.  I'll rule on that.

6          Let me hear briefly on the motion for bill of

7  particulars with respect to the funding issue.

8          MR. MURPHY:  Good morning, Your Honor.  Jack

9  Murphy on behalf of Bijan Rafiekian.

10          THE COURT:  Good morning.

11          MR. MURPHY:  In prior briefing, the

12  government made the claim that the government of

13  Turkey, quote, unquote, funded FIG's work for Inovo.

14  Now, that would, obviously, be a significant fact if it

15  were true and if the defendant knew about it.  So in

16  this motion, what we did was we challenged the

17  government to describe the evidence in support of that

18  claim.

19          And I think that the government's response or

20  really lack thereof is revealing on this point.  It

21  turns out the government doesn't really have any

22  evidence in support of this claim.  They have really

23  just speculation.  They certainly don't have any bank

24  records or anything else that would lead a reasonable

25  juror to determine that this money actually came from

1  the Turkish government.

2          So as a result, it would be highly

3  prejudicial if the government were permitted to make

4  this claim either in opening statement or in their

5  concluding remarks.

6          The government says that this issue is moot

7  with respect to the opening statement because they

8  don't intend to make any argument in their opening

9  statement.  But if you read the government's opposition

10 closely, you will see they don't actually promise not

11 to make this specific statement or claim in their

12 opening statement.  They just say as a general matter

13 that they won't make any argument.  So for this reason,

14 the issue is not moot, and the Court should issue an

15 order precluding the government from stating in its

16 opening statement that it has evidence that the

17 government of Turkey actually funded the FIG-Inovo

18 engagement.

19         With respect to closing argument, the

20 government argues that the issue is premature, but we

21 would submit that given that the government has been

22 unable to come up with really any evidence in support

23 of its claim, the issue is not premature at all.  At a

24 minimum, the Court should hold that the evidence that

25 has been submitted by the government is insufficient to

1  support the argument.  And if at trial the government

2  does come up with additional evidence in support, then

3  we can revisit the issue at that time.

4           Now, with respect to our request for a bill

5  of particulars, whether we need a bill of particulars

6  or not is really dependent on whether the government is

7  aware of any other information in its possession on

8  this issue that it hasn't identified in its opposition

9  brief.

10          If the sole basis for the government's claim

11  that Turkey funded the engagement has been identified

12  in the opposition, then we don't need a bill of

13  particulars.  We have the information we need.  But if

14  on the other hand the government has some other

15  evidence in mind, then we do need to know that before

16  trial.  If it turns out that contrary to all the

17  evidence that we've seen and all the speculation in the

18  government's brief that Turkey actually was funding

19  FIG's work, that would be a significant piece of

20  evidence, and we need to know it so we can help prepare

21  our defense.

22          So I would respectfully ask that the Court

23  pose that question to the government:  Is there

24  anything else?  If not, we can withdraw the request for

25  the bill of particulars.

1           THE COURT:  All right.  Thank you.

2           MR. MURPHY:  Thank you.

3           THE COURT:  Counsel, Mr. Gillis.

4           MR. GILLIS:  First of all, Your Honor, it's

5   well established that the government is not required to

6   reveal its evidence that it plans to introduce at

7   trial, particularly not testimony that it might

8   introduce.  So a bill of particulars is certainly not

9   an appropriate way of doing that.

10          We have revealed to the defense all of the

11  exhibits that we had.  As I said at the outset, we

12  provided them with the core documents to the case in a

13  single packet of documents.

14          With respect to -- there has been also

15  fulsome discovery on that.  Yes, we're not able to show

16  bank account records for those transactions, and that's

17  because Alptekin wrote the checks from him to FIG from

18  his personal account in Turkey.  Obviously, given the

19  level of Turkish officials involved in this conspiracy,

20  it's fairly unlikely that they would produce through

21  some of MLAT process the bank statements that are

22  sought that we would otherwise like to have but we

23  don't have.

24          But we have inferences from that, Your Honor.

25  The payments, the kickbacks go to Alptekin's company.

1  The kickbacks themselves show that the funding is

2  coming -- or at least certainly provide a strong

3  inference that the funding is coming from somewhere

4  else.  Why otherwise would Alptekin send money to FIG

5  from his Turkish account only to have FIG immediately

6  kick back 20 percent of that to Alptekin?

7           Also, this notion of him being a consultant

8  suggests that he's a consultant on a project that

9  allegedly he is --

10          THE COURT:  Right.

11          MR. GILLIS:  -- the client for.  So I believe

12 you've heard enough on that point, Your Honor.

13          THE COURT:  Let me ask you:  Are you aware of

14 anything else other than what you've put in your

15 opposition that you think you may be submitting for the

16 funding issue specifically -- it's a very narrow

17 issue -- as opposed to argument?

18          MR. GILLIS:  As opposed to argument, Your

19 Honor?

20          THE COURT:  Yes.

21          MR. GILLIS:  We may present testimony that

22 may bear upon that, but that would not -- no, Your

23 Honor.  The documentary evidence is pretty much as it

24 is.  Well, I shouldn't say -- obviously, it will be

25 presenting bank statements that show -- the U.S. bank

1    statements that we've been able to obtain.  We have

2    some evidence from the government of -- from Norway --

3    or rather from the Netherlands which is where Inovo --

4    we've turned all of that over to the defense.

5              THE COURT:  Right.

6              MR. GILLIS:  There is some evidence from the

7    government of Israel that relates to this Inovo project

8    and the monies that were made to Inovo.  Those, too, we

9    have turned over to the defense.

10             THE COURT:  Right.

11             MR. GILLIS:  There's also Skype chats that

12   refer to payments and Skype chats that refer to

13   deposits.  So I don't know that we have articulated,

14   nor are we required to articulate our entire theory of

15   the defense.

16             THE COURT:  Those are the payments from Inovo

17   to FIG and from FIG to Alptekin?

18             MR. GILLIS:  The payments from Alptekin to

19   FIG and from FIG to Inovo.

20             THE COURT:  That's right.

21             MR. GILLIS:  Plus, there is, for example,

22   also the green light letter and the authorization

23   coming from the highest --

24             THE COURT:  That's all been disclosed here?

25             MR. GILLIS:  Yes, Your Honor.

1            THE COURT:  Nothing else you can think of at

2  this point?

3            MR. GILLIS:  Not at this point, Your Honor.

4            THE COURT:  All right.  I believe that covers

5  argument, really, on the issues that cross all the

6  motions.

7            What I want do is I'd like to have complete

8  briefing on the motion to dismiss before the Court

9  rules on these.  I think all of these issues are really

10  bound up.

11            When can you get your opposition in,

12  Mr. Turgeon?

13            MR. TURGEON:  Your Honor, we agree with

14  defense counsel, that the opposition will be filed on

15  June 20.

16            THE COURT:  All right.

17            MR. TURGEON:  I believe the reply on the

18  25th.

19            Is that right?

20            MS. MITCHELL:  That's what we had spoken

21  about, Your Honor, with the hope that we could do

22  argument on the 28th.

23            THE COURT:  All right.  That's fine.  Let's

24  do it on the 28th.  All right.

25            MS. MITCHELL:  Thank you.

1          THE COURT:  All right.  Anything else that
2    anybody wants to raise?
3          MR. GILLIS:  Not from the government, Your
4    Honor.
5          MS. MITCHELL:  Nothing further, Your Honor.
6          Thank you.
7          THE COURT:  All right.  Mr. Gillis, you said
8    you would like a further opportunity to brief something
9    on the opinion work product issue.  If you would like
10   to do that, you have leave to file.
11         MR. GILLIS:  Your Honor, I submit that it
12   would be more appropriate to have them affirmatively
13   assert the work product doctrine and establish the
14   facts that they must assert in order to --
15         THE COURT:  Well, they've raised it.  They've
16   raised it fairly squarely, I think, in their
17   opposition.  If you have anything more to say about it,
18   I will give you an opportunity to file what you'd like.
19         MR. GILLIS:  May I?
20         THE COURT:  Yes.
21         MR. GILLIS:  I'd like to just address -- part
22   of what we would address in our briefing, Your Honor,
23   would be that they need to articulate what the
24   litigation was that was anticipated at the point which
25   this work product was allegedly produced.  So I would

1  be arguing in a vacuum if --

2          THE COURT:  Well, I think it's clear that

3  their position is that it was the inquiry from the DOJ

4  that was a sufficient context for the assertion of the

5  work product privilege.  Again, if you would like to

6  file anything supplemental on that other than what

7  you've argued here, you have leave to do that.

8          MR. GILLIS:  Yes, Your Honor.

9          THE COURT:  All right.

10          MR. GILLIS:  Thank you.

11          THE COURT:  Anything else?

12      (No response.)

13          THE COURT:  All right.  Thank you.

14          The Court will stand in recess.

15          -----------------------------------
                    Time:  11:48 a.m.
16

17

18

19

20

21
        I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR