UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BIJAN RAFIEKIAN, *et al.*, | ) | Case Number 1:18-cr-457-AJT-1 |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **MEMORANDUM OPINION**

On July 23, 2019, after a six-day jury trial, Defendant Bijan Rafiekian was convicted on

one count of conspiracy in violation of 18 U.S.C. § 371; and one count of acting in the United

States as an unregistered agent of a foreign government, namely the government of Turkey, in

violation of 18 U.S.C. § 951. The Defendant moved for a judgment of acquittal at the close of the

Government's case in chief, renewed that motion at the close of all the evidence and following

the verdict, filed a Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure

29 [Doc. No. 342] (the "Motions for Acquittal") and Motion for a New Trial [Doc. No. 361] (the

"Motion for New Trial") (collectively, the "Motions"). The Court held a hearing on the Motions

on September 12, 2019, at the conclusion of which it took them under advisement. For the

reasons stated below, the evidence was insufficient as a matter of law for the jury to convict

Rafiekian on either count. Because the verdict was against the heavy weight of the evidence and

because of other issues pertaining to the conduct of that trial, as discussed below, a new trial is

also warranted in the interests of justice should the Court's judgment of acquittal be later vacated

or reversed. Accordingly, the Motions for Acquittal are GRANTED; and the Motion for New

Trial is conditionally GRANTED.

# I. BACKGROUND

A six-count indictment [Doc. No. 1] was issued against Rafiekian and Kamil Ekim Alptekin on December 12, 2018, and a superseding indictment was issued against them on May 23, 2019 [Doc. No. 141]. Count One of the superseding indictment charged Rafiekian and Alptekin under 18 U.S.C. § 371 with conspiracy to (1) act as an agent of the Turkish government without prior notification to the Attorney General in violation of 18 U.S.C. § 951 and (2) file a materially false filing under the Foreign Agents Registration Act ("FARA") in violation of 22 U.S.C. § 618(a)(2). Count Two charged both Defendants under 18 U.S.C. § 951 ("Section 951") with knowingly acting and causing others to act in the United States as agents of the Turkish government without prior notification to the Attorney General, as required by law. Alptekin, who resides in Turkey and has not appeared in this action except for the limited purpose of opposing the Government's Motion to Establish the Crime-Fraud Exception as to him, *see* [Doc. Nos. 188, 216], was also charged with four additional counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). Beginning on July 15, 2019, the case against Rafiekian was tried before a jury. On July 23, 2019, the jury found Rafiekian guilty on Counts One and Two of the superseding indictment.

In summary, the following evidence was presented:

Rafiekian was the Vice-Chairman, Director, Secretary, and Treasurer of the Flynn Intel Group ("FIG"), which he co-founded and co-owned with retired Lt. Gen Michael Flynn, FIG's Chairman and CEO.[1] Alptekin is a Turkish businessman who is the owner of Inovo, BV, a Dutch

---

[1] Rafiekian, a U.S. citizen, has also held a variety of public-sector positions, including serving on the board of directors of the Export-Import Bank of the United States, a position for which he was nominated by President George W. Bush and confirmed by the Senate. *See* Trial Tr. 911:22-25, [Doc. No. 334] (Chatham).

2

company located in the Netherlands, and who was previously the Chairman of the Turkish-American Business Council.

On or about September 8, 2016, Flynn, on behalf of FIG, and Alptekin, on behalf of Inovo, entered into a written agreement, titled the Independent Advisory Services Agreement (the "Agreement").[2] *See* GEX 58 at 6. The Agreement stated that "[Inovo] is desirous of engaging [FIG] for a specified scope of work aimed at design and delivery of a series of results in discovery, analysis, packaging and presentation of findings in a credible, durable and easy to disseminate format over a period of three months from the execution of this agreement." *Id.* The Agreement described the contemplated work as an "independent study and investigation engagement," and specified that "[FIG's] team" dedicated to the engagement would include Sphere Consulting ("Sphere"), "a top-tier public affairs and strategic reputation management firm based in Washington DC with global reach." *Id.* With regard to the nature of the relationship between FIG and Inovo, the Agreement stated:

> [FIG] is not an employee or agent of [Inovo]. [FIG] is an independent contractor engaged for specific purpose of providing advice relating to assisting the client with accomplishing the objectives of this engagement. [Inovo] expects [FIG] to act with complete objectivity in the design and execution of its investigative mission pertaining to this engagement. Further, [Inovo] is by no means dictating to [FIG] a specific predetermined outcome or a particular result. [FIG] acts in good faith and on the basis of best effort to obtain the goals of the engagement. The parties to this agreement recognize that [FIG] is not in a position to guarantee results in matters outside of [FIG]'s control.

*Id.* As to the scope of services, the Agreement provided:

> [FIG] will activate its investigative laboratory comprised of its most senior principals including but not limited to former Director of United States Central Intelligence Agency, Former Director of the United States Defense Intelligence Agency, Former [C]hairman of the Audit Committee of the Export Import Bank of the United States, former Director of Intelligence for the Joint Chiefs of Staff,

---

[2] Flynn and Alptekin's signatures on the Agreement are dated "8/9/2016," which appears to be the European date format for September 8, 2016; and there has been no contention that the signatures were backdated to August 9, 2016. *See* GEX 22A, 22B, 58.

> Former Special Operations (Green Beret) investigator and intelligence officer, former Deputy Assistant Director of Federal Bureau of Investigations of the United States, [f]ormer senior legal counsel to the United States Senate Committee on Intelligence, two senior former FBI specialist investigators, Chairman of the Asymmetric Institute of the Department of Military Studies at Johns Hopkins University and the head of Flynn Intel Group's Special Operations Cyber Force. [FIG] has also retained an experienced filming and production crew with top-quality experience with outlets such as Reuters, Aljazeera, CNN, France 24 and other major media outlets. [FIG] shall hold weekly calls throughout the engagement over the period of 90 days to report engagement progress to [Inovo]. [FIG]'s Public Affairs unit will continue its specialized work throughout the engagement period. Lieutenant General Michael T. Flynn, Ret. U.S. Army, former Director of Defense Intelligence Agency shall lead this engagement.

*Id.* at 6-7. The Agreement recited that as compensation for its professional services, FIG would receive "a firm, fixed price of $600,000," comprised of three payments of $200,000 each, together with expenses. *Id.* at 7. The parties agreed that the Agreement should remain confidential "throughout the course of this engagement and after its termination" because "disclosing the details of this engagement will adversely impact the quality of investigations." *Id.*

As outlined in a "draft playbook" prepared by Rafiekian and sent to Flynn on September 5, 2019 (the "Playbook"), FIG's contemplated team for the engagement with Inovo was to include as many as 19 individuals who would play various roles, including Flynn as "Engagement lead"; Rafiekian and Phil Oakley of FIG as "Strategy"; Alptekin as "Strategy support"; Brian McCauley of FIG as "Investigation lead"; Mike Boston of FIG as "Engagement coordinator"; Jim Courtovich of Sphere as "Public Affairs/media"; and others for roles such as "Video production team lead," "Finance support," "Interviewer/ commentator," "Investigations," "Senior Advisor," "Legal and Compliance," "Cyber Ops," and "Sentiment Analysis."[3] *See* GEX 23A, 23B. The Playbook also identified the "[m]ission" of the engagement as the investigation and documentation of the activities of "X", known to be Fethullah Gulen, including his ideology,

---

[3] The record is unclear concerning what precisely the legal relationship was between these individuals and FIG – that is, whether they were FIG employees or independent contractors.

4

influence, and relationships with American political leaders.[4] GEX 23B at 1-2; *see also* Trial Tr. 472:9-12, [Doc. No. 330] (Boston) (confirming that "X" referred to Gulen). The "[e]nd product" of the engagement was identified as "[a] 60 minutes video production documenting the investigations." GEX 23B at 1. As part of the engagement, the Playbook provided that Flynn would participate in one hour "weekly briefings with [Inovo]/ client." *Id.* at 3.

The Playbook also included the "Sphere Plan of Action," *id.*, which was originally prepared by Courtovich of Sphere on August 18, 2016 following an August 16, 2016 meeting between Sphere and FIG about the proposed engagement, and was sent to Rafiekian that same day by Graham Miller, another Sphere partner, *see* GEX 96A, 96B; Trial Tr. 701:24-702:3, [Doc. No. 333] (Courtovich); Trial Tr. 602:22-604:5, [Doc. No. 331] (Miller). The Plan of Action stated that Sphere was being engaged "to implement an effective public affairs campaign to support and promote the work undertaken by [FIG]" and that "this effort would be funded directly by private businesses seeking to improve investment in business to drive a stronger economy."[5] GEX 23B at 3. At the time the Plan of Action was drafted, the details of Sphere's engagement with FIG were to be worked out in order to find "a path forward." *Id.* at 6. FIG subsequently retained Sphere as a subcontractor in connection with its engagement by Inovo; and for that purpose, on or about September 20, 2016, FIG entered into a separate Memorandum of

---

[4] Part of the "[m]ission" was also identified as to "[r]egister under [the] Lobbying Disclosure Act representing a Dutch entity," a task that was assigned to Bob Kelley, who was to fill the Legal & Compliance role on the team for the engagement. GEX 23B at 1.
[5] The Sphere Plan of Action listed the "[o]bjectives" of the engagement to include, among others, the following: (1) "[p]osition Turkey as a pragmatic, unbiased, centrist nation that understands the importance of stable institutions, the rule of law, and international cooperation"; (2) "[r]eestablish international confidence in Turkey's economic fundamentals and highlight the stability of its investment and business environment"; and (3) "[e]ncourage and strengthen relations between the business communities of Turkey, Europe, and the United States." GEX 23B at 4. It also identified the "[s]trategic [a]pproach" to include the following: (1) "[p]roduce and promote a documentary style video that uses fact-based, unbiased information and research to 1) highlight Fethullah Gulen's network of loyalists and his influence over them and 2) showcase a resilient investment climate in the wake of the recent attempted coup"; and (2) "[d]emonstrate the success and stability of Turkish institutions that serve as key measures of a functional government and prosperous investment climate" *Id.*

Understanding with S.G.R. LLC Government Relations and Lobbying ("SGR"), Sphere's "sister entity" through which it handled lobbying-related projects.[6] *See* GEX 107A, 107B. This MOU stated that SGR would work with FIG "to develop and execute a public affairs plan to encourage and strengthen relations between the governments and business communities of Turkey, Europe, and the United States." GEX 107B. As compensation for these services, SGR would be paid $30,000. *Id.*

FIG also appears to have entered into a separate Independent Advisory Services Agreement with Alptekin personally, pursuant to which Alptekin was to be compensated by FIG for his "professional services" at a rate to "be negotiated and agreed upon on each task," with an additional $40,000 "mobilization fee" paid to him at the time the agreement was executed.[7] *See* GEX 127B. The agreement provided that "subsequent payments shall follow task orders to be issued by [FIG], followed by an invoice by [Alptekin]. Invoices issued by [Alptekin] shall be based on approved task orders by [FIG] prior to the performance of advisory work. [FIG] shall pay all approved invoices within five business days from receiving said invoices."[8] *Id.* The agreement specified that Alptekin was not an agent or employee of FIG, but rather "an

---

[6] The version of the Memorandum of Understanding in evidence is a draft agreement attached to a September 21, 2016 email from Miller of Sphere to Rafiekian. *See* GEX 107B. Miller represented in his email that if the draft was "agreeable to [Rafiekian]," the parties could execute the agreement immediately. GEX 107A. There is not in evidence an executed version of the agreement.

[7] The only executed agreement in evidence is signed by Flynn, whose signature is dated September 9, 2016, but not by Alptekin, *see* GEX 127B, and is attached to an October 30, 2016 email from Flynn to Rafiekian where he asks Rafiekian to "check it one more time before forwarding," GEX 127A. Rafiekian emailed a draft agreement to Flynn on September 12, 2016, *see* GEX 25C, and bank records in evidence indicate that FIG paid Inovo a $40,000 "consultancy fee" on September 13, 2016, *see* GEX 25A at 3.

[8] There are no task orders issued by FIG in evidence, but Alptekin and/or Inovo issued an invoice to FIG dated October 14, 2016 for a $40,000 "consultancy fee," which Rafiekian approved for payment that same day and was paid on October 17, 2016. *See* GEX 35A, 35B; GEX 34 at 3. On November 10, 2016, Rafiekian acknowledged in an email to Alptekin that FIG owed Inovo $55,000 for "research and consultation services," and asked that Alptekin provide an invoice to facilitate payment, which FIG would pay after it received a $200,000 payment from Inovo. GEX 37A. The next day, another invoice was issued by Inovo to FIG for consultancy fees in the amount of $55,000. GEX 161. Bank records on November 14, 2016 indicate that a payment of $145,000 was made from Alptekin to FIG, reflecting the $200,000 owed to FIG pursuant to its invoice, minus the $55,000 consultancy fee. *See* GEX 38 at 3; *see also* Trial Tr. 376:23-381:20, [Doc. No. 330] (Smith) (summarizing payments).

independent contractor engaged for the specific purpose of providing advice relating to assisting [FIG] in any given tasks assigned to [Alptekin].[9] *Id.*

In August, 2016, Rafiekian contacted Robert Kelner and Robert Lenhard of Covington & Burling LLP ("Covington") to obtain advice concerning FARA. Covington was not retained at that time because of those lawyers' political views pertaining to the then-candidacy of Donald Trump for President of the United States. *See* Trial Tr. 270:12-272:23, [Doc. No. 326] (Kelner). Rafiekian then consulted with Robert Kelley, a lawyer with experience in FARA and related statutory registration requirements who went on to become FIG's general counsel. *See* GEX 173. In response to Rafiekian's inquiry concerning any FARA filing obligation, Kelley asked whether the client was a foreign government or a foreign political party, and Rafiekian said that it was a private company. *Id.* at 1-2; Trial Tr. 858:4-8, [Doc. No. 334] (Kelley). Based on that representation, Kelley advised Rafiekian that no FARA registration was required, and that it would be sufficient for FIG to register under the Lobbying Disclosure Act ("LDA"). Trial Tr. 859:14-860:19, [Doc. No. 334] (Kelley); GEX 173 at 1. Sometime after his conversation with Kelley, Rafiekian told McCauley that, while Flynn had wanted to register with the Department of Justice ("DOJ") under FARA, Rafiekian wanted to "keep [the project] under the radar" by instead registering with Congress – seemingly referring to registering under the LDA. Trial Tr. 412:23-413:5, 414:1-13, [Doc. No. 330] (McCauley). FIG did, in fact, register under the LDA in September of 2016 in accordance with Kelly's advice. *See* GEX 166.[10]

---

[9] Robert Kelner, the Covington & Burling lawyer who represented FIG in connection with its FARA filing, testified that he was told by Rafiekian that Alptekin "never actually rendered consulting services to FIG," Trial Tr. 247:16-20, [Doc. No. 247] (Kelner), and that the payments that were made "were actually refunds, not consulting fees," *id.* at 249:15-19.

[10] The Government has not charged Rafiekian or anyone else with a violation of the LDA in connection with the limited amount of lobbying that Rafiekian and others engaged in.

On September 19, 2016, in a meeting arranged by Alptekin, Rafiekian, Flynn, and Brian

McCauley met with Alptekin, MC, and then-Turkish Minister of Energy and Natural Resources

Berat Albayrak ("BA"), President Erdogan's son-in-law, in New York City. *See* Trial Tr.

405:20-24, [Doc. No. 330] (McCauley).[11] The meeting lasted about twenty-five to thirty minutes,

*id.* at 409:13-14, 440:11-13, and mostly consisted of the Turkish officials expressing their

negative opinions regarding Gulen, *see id.* at 440:18-441:8. During that meeting, there was no

discussion concerning any work that FIG was doing or of FIG's relationship with Inovo or the

Turkish government, nor was there any request from the Turkish officials or Alptekin for FIG to

do anything. *Id.* at 440:14-17, 442:1-3.

FIG continued its work on the engagement following the meeting, and as contemplated in

the Agreement, FIG's representatives – Rafiekian, Flynn, and Michael Boston – held weekly

telephone conferences with Alptekin, who was viewed as the client, to update him on the work

being performed. *See* Trial Tr. 458:25-459:15, 465:1-25, [Doc. No. 330] (Boston); 525:13-19,

[Doc. No. 331] (Boston).

On November 2, 2016, Rafiekian, McCauley, Boston, and Kelley, along with Miller and

Courtovich from Sphere, met with Alptekin to present an update on the project. Alptekin was not

pleased with the scope or substance of what was presented to him, which included a presentation

by McCauley summarizing the findings of the investigation into Gulen and a mockup of the

Gulenopoly board game conceived by Sphere. *See* Trial Tr. 720:2-8, 720:19-721:4, [Doc. No.

333] (Courtovich); 526:25-527:8, [Doc. No. 331] (Boston).[12]

---

[11] Also present at that meeting was former Director of the CIA James Woolsey, who attended on behalf of FIG but does not appear to otherwise have been heavily involved in the engagement, as well as a translator.

[12] Alptekin said, *inter alia*, that he "need[ed] more" than the information that had been presented, which he complained was information that had already been obtained on Gulen, and asked, "This is what I paid for?" "What do I tell Ankara?" *See* Trial Tr. 723:3-9, [Doc. No. 333] (Courtovich); 431:23-432:4, 444:6-8, [Doc. No. 330] (McCauley)

Later that same day, Rafiekian drafted an op-ed to be published under Flynn's name, which he circulated to Alptekin and Bob Kelley with the message, "A promise made is a promise kept." GEX 45A, 45B.[13] On November 3, 2016, Rafiekian forwarded a draft to Flynn and asked him "to make any changes you see necessary and let me know if we can release this to Sphere so that they can place it too." GEX 70A, 70B. On November 6, Flynn returned the op-ed to Rafiekian "with substantive changes." GEX 76A, 76B. Miller and Sphere were tasked with having the op-ed published and through those efforts, the op-ed entitled *Our Ally Turkey Is In Crisis and Needs Our Support* was published under Flynn's name in *The Hill* newspaper on November 8, 2016. *See* DEX 50 (op-ed as published in *The Hill*).

That same day, Donald Trump was elected President of the United States; and subsequently, Flynn was selected as National Security Advisor and FIG ceased operations. As a result, the engagement covered by the Agreement, including the contemplated video, was never completed, and no video, research, or information related to the Agreement was presented or distributed by FIG or Rafiekian to the public or to any public official. *See* DEX 60 at 1 ("After General Flynn was named in mid-November 2016 to serve as National Security Advisor in the new administration, [FIG] shut down its operations, did not renew its contract with Inovo BV, and filed, on December 1, 2016, a final public disclosure report terminating its lobbyist registration for Inovo BV."); *id.* at 25 ("Because the project was terminated early, the full scope of the contract was not performed, and to the best of [FIG's] knowledge, none of the research

---

[13] The only other evidence about the possibility of an op-ed through FIG was that during a conference call on October 7, 2016 between FIG's representatives and Alptekin reporting on the progress of the engagement, the possibility of an op-ed was mentioned, together with the need for additional funding were that pursued since FIG viewed the op-ed to be "outside of the scope of the original contract." Trial Tr. 483:20-484:11, [Doc. No. 330] (Boston); *see also* GEX 43B at 7 (FIG would "attempt to have an [op-ed] written that links funding, Islamists, and [Gulen] et al as Mullahs/Imam[s]."). In their interviews with Kelner, the Covington lawyer advising FIG with regard to the FARA filing, Rafiekian and Flynn stated that the op-ed published in *The Hill* was not written as part of FIG's engagement by Inovo. *See* Trial Tr. 235:2-7, 236:24-237:4, [Doc. No. 326] (Kelner).

materials prepared by [FIG] were disseminated to third parties."); Trial Tr. 564:2-11, [Doc. No. 331] (Enders).

Following the publication of the op-ed, the FARA Registration Unit of the United States Department of Justice sent a letter to Flynn, dated November 30, 2016, in which it asked for additional information concerning the op-ed and FIG's relationship with Alptekin and Inovo so that it could determine whether FIG, Flynn, or anyone else should file a registration statement under FARA. *See* GEX 90. FIG and Flynn subsequently retained Covington to represent them in connection with any potential FARA filing; and Covington initially responded by letter dated January 11, 2017,[14] in which it advised how it contemplated responding on behalf of FIG and Flynn. GEX 92. Covington conducted an investigation, which involved reviewing documents and communications related to the Agreement, including an opinion letter prepared by Alptekin's counsel, as well as conducting interviews with Rafiekian, Flynn, and other FIG personnel, *see* Trial Tr. 223:9-13, [Doc. No. 326] (Kelner). Covington ultimately decided based on its investigation to file a complete FARA registration statement on March 7, 2017 on behalf of FIG, *see* DEX 60, including short form registration statements filed on behalf of Flynn and Rafiekian as the directors and officers of FIG, *see* GEX 64, 65.[15] These registration statements listed Inovo, and not the government of Turkey, as the foreign principal.

On December 1, 2017, Flynn pled guilty in a separate case to unrelated charges and entered into a plea agreement and cooperation agreement with the Government, pursuant to which he agreed to cooperate with the Government in its ongoing investigations and

---

[14] As Covington noted in its letter, Flynn did not become aware of the DOJ letter until December 24, 2017 because FIG "generally suspended its activities in mid-November, including the use of the office to which the letter was sent." GEX 92 at 1.
[15] Covington's January 11, 2017 letter stated that FIG would likely register under FARA, but had not yet made a final determination as to who should be listed as the foreign principal on the FARA registration. *See* GEX 92.

prosecutions, including by providing information, documents, and testimony for this case, if requested to do so by the Government. *See* Trial Tr. 317:3-319-9, [Doc. No. 326] (Kelner).

Neither the original nor superseding indictment in this case references Flynn as a member of the alleged conspiracy or as an agent of the Turkish government; and in response to the Court's explicit questioning, the Government stated in open court that Flynn, who it planned to call as a witness, was not a member of the charged conspiracy and that it would not rely upon his testimony to establish the foundation for the admission of Alptekin's hearsay statements under Fed. R. Evid. 801(d)(2)(E). *See* June 13, 2019 Hearing Tr. 65:9-22, [Doc. No. 213]; *see also* [Doc. No. 109] (Government's Bill of Particulars not listing Flynn as a co-conspirator whose statements would be used at trial). Then on July 3, 2019, the Government filed a Notice of Correction to the Record [Doc. No. 261], in which it advised the Court that it no longer planned to call Flynn as a witness in its case in chief. The Government also took the position for the first time, contrary to its earlier in-court statements, that Flynn was regarded as a co-conspirator and that it would seek to have his out-of-court statements introduced pursuant to Fed. R. Evid. 801(d)(2)(E).

In its Memorandum Opinion and Order dated July 9, 2019 [Doc. No. 292] (the "July 9 Order"), the Court concluded that the out-of-court hearsay statements of Alptekin and Flynn were not admissible under the co-conspirator exception to the hearsay rule set forth in Fed. R. Evid. 801(d)(2)(E); and these documents were admitted for the limited purpose of showing what information was received by Rafiekian, not for the truth of the matters asserted in those statements. *See e.g.*, Trial Tr. 154:6-9, [Doc. No. 325] (Rosecrans) (admitting GEX 9 "solely for the purpose of establishing what Mr. Rafiekian received, the information he received, and not for the truth of what's stated in this email").

Against this background, the Government claimed that Rafiekian (but no one else who was part of the FIG team) engaged in the alleged conspiracy and acted as an undisclosed agent of the Turkish government; and that the evidence was sufficient for a jury to convict Rafiekian of those offenses based on (1) communications between Rafiekian and Alptekin; (2) Rafiekian's other statements; (3) the payments to Alptekin; (4) a meeting with officials from the Turkish government in New York City on September 19, 2016, attended by Rafiekian, Flynn, Alptekin, and others; (5) the periodic reporting to Alptekin; (6) the publication of Flynn's op-ed in *The Hill* on November 8, 2016; and (7) the substance of the FARA filing prepared by Covington and the information provided to Covington for that purpose.

Generally summarized, the evidence of Rafiekian's communications included, in addition to what is referenced above, the following:

Starting on July 27, 2016, Rafiekian began to exchange email messages with Alptekin about the potential engagement of FIG for a project that Rafiekian viewed as important to promoting Turkey's "security and stability," which he viewed as "extremely important to world security." GEX 8A. On July 29, 2016, Alptekin stated by email that he had met with Turkish Minister of Foreign Affairs Mevlüt Çavuşoğlu ("MC"), who was "interested in exploring this seriously," had asked Alptekin to prepare an "indicative budget," and would likely want to meet with Rafiekian and Flynn. GEX 9. On July 30, 2016, Rafiekian sent an email to Alptekin, copying Flynn, with the subject line "Truth," in which he outlined the general contours of an engagement that he called, for the first time, the "truth campaign." Several emails between Alptekin, Rafiekian, and Flynn with the subject line "Truth" followed, in which Alptekin described the discussions he was having with various Turkish officials about retaining FIG for the purpose of promoting the extradition of the Islamic cleric Fethullah Gulen, a U.S. resident

whose extradition the Turkish government had been unsuccessfully attempting to procure

following an attempted coup d'état in Turkey on July 15, 2016. *See* GEX 14, 15, 16; *see also*

Trial Tr. 95:13-99:18, [Doc. No. 325] (Olson) (describing the Turkish government's

unsuccessful attempts to extradite Gulen following the attempted coup). In the last email in this

chain, dated August 10, 2016, Alptekin reported to Rafiekian and Flynn that he had "just

finished" several meetings with MC and Turkish Minister of the Economy Nihat Zeybekci

("NZ"), and had a "green light to discuss confidentiality, budget and the scope of the contract."

GEX 16.

The next day, August 11, 2016, Rafiekian sent an email to Alptekin to set up a call with

Alptekin and Flynn. In that e-mail, he stated that he and Flynn had "activated the FIG LAB"

(referring to FIG's inventory of associated consultants) and were "ready to push the start button

immediately" on the project, which Rafiekian described as an engagement of FIG by the

"business community" to restore "confidence through clarity" in Turkey's trade and investment

climate. GEX 17. Rafiekian's email suggested that he had reached out to Jim Courtovich,

Sphere's founder and managing partner, about the project, and that he had structured the

engagement so that Alptekin would receive an "advisory support fee" of 20% of the

compensation FIG received for its services. *Id.* That same day, Rafiekian sent an internal FIG

email in which he informed others within the company that they were "about to be engaged by a

Dutch client" for the "Confidence Through Clarity Campaign," where the end product would be

a 30-45 minute video production, and provided a budget for the project. GEX 18A, 18B.[16]

---

[16] The Government has relied heavily on the designation of the project at this point as "Project Confidence" rather than the "Truth Campaign," which was first referenced in Rafiekian's July 30, 2016 e-mail, contending that this was a re-labelling of the project intended to conceal that FIG was being retained by the government of Turkey, as it had originally hoped for, and not by Inovo, funded by Turkish businessmen.

There is little evidence of further communications between Alptekin and Rafiekian or anyone else at FIG concerning the proposed engagement over the next two weeks, though FIG did meet with Sphere on August 16, 2016, which led to Sphere's submitting a proposal to FIG titled "Partnership to Promote a Prosperous and Stable Turkey" two days later on August 18, 2016.[17] *See* GEX 96A, 96B; *see also* Trial Tr. 701:24-702:3, [Doc. No. 333] (Courtovich); Trial Tr. 602:22-604:5, [Doc. No. 331] (Miller). Based on Rafiekian's representations at the August 16 meeting, Sphere's proposal stated that the engagement was being "funded directly by private businesses seeking to improve investment in business to drive a stronger economy" and Sphere's role was to "[p]roduce and promote a documentary-style video that uses fact-based, unbiased information and research to 1) highlight Fethullah Gulen's network of loyalists and his influence over them, and 2) showcase a resilient investment climate in the wake of the recent attempted coup." GEX 96B; *see* Trial Tr. 603:14-21, 604:1-11, [Doc. No. 331] (Miller).

On August 25, 2016, Rafiekian sent an email to Alptekin thanking him for engaging FIG on Operation 'CONFIDENCE.'" GEX 19. The email further stated that Flynn would personally lead the engagement; that FIG would provide a draft engagement letter between FIG and Inovo that would "not entail operation details for obvious reasons"; that the parties would finalize the allocation of costs for Sphere; and that Alptekin would receive twenty percent of the money paid to FIG for his "professional advisory services." *Id.* That same day, Rafiekian and Alptekin exchanged Skype chat messages in which Alptekin told Rafiekian, "We are confirmed to go[.] Meeting him tomorrow evening for details." GEX 20. Alptekin went on to say (in an apparent reference to Turkish President Recep Tayyip Erdogan) that he believed he was meeting MC's

---

[17] The only communications in evidence between Rafiekian and Alptekin during this time are two Skype messages dated August 13 and 14, 2016 in which Rafiekian informs Alptekin that he has reached out to and connected with Courtovich, GEX 67B, 67C, and a third Skype message in which Rafiekian tells Alptekin that he is available to speak with him, GEX 67D.

boss, "not direct boss but [you] know who," and that his assumption was "based on [MC's] request to come to 3rd bridge opening tomorrow for final instructions."[18] *Id.* Alptekin went on to say "[E]ither way he said we are a full go," to which Rafiekian responded, "We are very pleased to see that [President Erdogan] is taking a decisive stance on fighting Radical Islam. We believe that [he] is 'uniquely' qualified to take this global leadership role." *Id.*

Rafiekian and Alptekin continued to exchange Skype messages in the following weeks, and on August 29, 2016, Alptekin sent Rafiekian a message saying, "We are contemplating the best way to pay and avoid additional cost. I will be depositing the total 200k on the [FIG] account. I will let you know when it is settled and will honor the deadline. We are also scheduling a meet[ing] with [Flynn] and MC and perhaps even [President Erdogan] in third week of NY. Will keep you posted." GEX 21. Rafiekian and Alptekin also exchanged several Skype messages regarding the engagement agreement between FIG and Inovo, which Rafiekian was having reviewed by a law firm for compliance, *see* GEX 67H, 67I, and on September 8, 2016, Alptekin sent Rafiekian two messages saying he would "send the agreement" and had "just left [the Prime Minister's] office," GEX 67J. The next day, September 9, 2016, Alptekin messaged Rafiekian saying that he "urgently need[ed] a BIC/swift code" for FIG's bank account as well as other account information, because Alptekin had "the money but need[ed] to deposit it [ASAP] before banks close." GEX 67K. Rafiekian provided the requested information and that same day a $200,000 wire transfer from Alptekin's bank account was deposited into FIG's account. *See* GEX 25A at 3.

Rafiekian and Alptekin also exchanged several Skype messages regarding the meeting in New York City that Alptekin had proposed between representatives of FIG and high-level

---

[18] The Court took judicial notice of the fact that the Third Bridge over the Bosphorus, which Alptekin appears to refer to here, opened on August 26, 2019. Trial Tr. 370:10-15, [Doc. No. 330].

Turkish government officials. *See* GEX 67O, 67P, 67Q; *see also* GEX 21 (Skype message from Alptekin to Rafiekian discussing scheduling a meeting between Flynn, MC, and potentially Erdogan). On September 15, 2016, Flynn reported to a U.S. Government agency that he planned to meet with Turkish officials, including the Turkish Foreign Minister and possibly including President Erdogan, in New York on September 19; and that FIG was supporting a Dutch company "to assist in renewing the confidence of the [i]nternational [c]ommunity in the Turkish [g]overnment," which he referred to as the "confidence project." DEX 6. On September 18, 2016, Rafiekian circulated talking points to Alptekin and Flynn in advance of the meeting, primarily relating to Gulen, *see* GEX 103A, 103B, to which Flynn then made minor edits, *see* GEX 104A, 104B.[19] The next day, on September 19, 2016, the meeting with the Turkish officials took place.

Following that meeting, in an email dated September 22, 2016, Rafiekian reported to Flynn on the positive feedback he had received from Alptekin about the meeting, but also noted that Alptekin, "[S]hared some very specific expectations with me which I dismissed immediately. I told him that the expectations are unreasonable . . . [and] [w]e deliver what we promise." GEX 29. On September 28, 2016 Rafiekian voluntarily disclosed in a meeting with a U.S. Government agency that he had "been asked to consult on a documentary-style commercial to raise awareness about" Gulen's charter schools and identified Alptekin "as a business contact" who had "senior level contacts in the Turkish government" and was "the sole owner of Inovo, a Dutch company." DEX 14.

---

[19] These same talking points were also distributed by Rafiekian at a meeting at the University Club with Sphere on September 20, 2016, the day after the meeting with the Turkish officials. *See* Trial Tr. 689:13-690:14, [Doc. No. 333] (Lowman); *id.* at 715:25-716:16 (Courtovich).

Following the publication of the op-ed on November 8, 2016, the only evidence of any further communications between Rafiekian and Alptekin is an e-mail dated November 11, 2016, in which Rafiekian forwarded to Alptekin a statement describing Inovo BV, which he intended to send to Sphere, GEX 83; and an e-mail dated January 18, 2017, from Alptekin to Rafiekian, forwarding an opinion letter from Alptekin's lawyer concerning "Advice on Regulations for the Foreign Economic Relations Board of Turkey," which Rafiekian forwarded to his lawyer, who forwarded it to Covington.[20] *See* GEX 93A, 93B; Trial Tr., 238:22-25; 239:1-3 [Doc. No. 320] (Kelner).

During Covington's investigation, Rafiekian stated that his early communications with Alptekin related to a possible engagement by the Turkish government,[21] but that the Turkish government backed out of those discussions and the contract with Turkey never came to fruition. *Id.*, 231: 1-5 [Doc. No. 320] (Kelner).  He further stated that after the Turkish government backed out, Alptkin said he wanted to engage FIG under a separate project through his Dutch company Inovo. *Id*, 230:11-15 [Doc. No. 320] (Kelner).  Rafiekian also stated that when it was originally contemplated that the client would be the government of Turkey, the project was originally referred to as Project Truth and that the name was changed to Project Confidence when the client became Inovo. *Id.* 228:6-7; 229:9-13 [Doc. No. 320] (Kelner).  Based on this explanation, Rafiekian described Project Confidence as "completely separate" from "Project Truth," that Project Truth "never happened" and that the Turkish government played no role in the contract that was actually entered into. Id., 229:23-24; 231:10-11 [Doc. No. 320] (Kelner). Similarly, he said that the meeting with Turkish officials on September 19, 2016 was unrelated to

---

[20] That opinion letter dealt primarily with Alptekin's status for the purposes of FARA as a result of his position as Chairman of the Turkish-American Business Council.

[21] Those discussions with Alptekin included Alptekin's statement that he had been given the "green light to discuss budget, confidentiality, and scope." *See* GEX 16; Trial Tr., 230:22-25; 231:1-7 [Doc. No. 320] (Kelner).

Project Confidence. *Id.*, 232:5-6 [Doc. No. 320] (Kelner). As to Flynn's op-ed, Rafiekian stated

that the op-ed was not part of Project Confidence and that it was Flynn's idea. *Id.* 235:5-12 [Doc.

No. 320] (Kelner).

## II. LEGAL STANDARD

The U.S. Constitution "protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In*

*re Winship*, 397 U.S. 358, 364 (1970). Federal Rule of Criminal Procedure 29 provides an

important safeguard for criminal defendants by requiring that "the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction." It is the sole province of the jury to "resolve conflicts in the testimony, to

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," *id.*,

and "where the evidence supports differing reasonable interpretations, the jury will decide which

interpretation to accept," *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc). For

that purpose, circumstantial evidence "is treated no differently than direct evidence, and may be

sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis

consistent with innocence." *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989). The

dispositive question on a Rule 29 motion is whether, after viewing the evidence in the light most

favorable to the prosecution and assuming that the jury resolved all contradictions in the

testimony in favor of the Government, "*any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

(emphasis in original). When, as here, a motion for judgment of acquittal is made at the close of

18

the Government's case and the court reserves decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).[22]

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government." *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) (citation omitted). "[A]ny error sufficient to require a reversal on appeal is an adequate ground for granting a new trial." 3 Wright & Miller, Fed. Prac. & Proc. Crim. § 589. But in considering whether to grant a new trial, "the district court should only overturn a jury verdict in the 'rare circumstance' when the verdict is against the great weight of the evidence." *United States v. Garcia*, 855 F.3d 615 (4th Cir. 2017) (quoting *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006)).

### III. ANALYSIS

Because the Government's case is built centrally on the contention that Rafiekian agreed to act as an undisclosed Turkish agent for the purposes of Section 951, the Court will first address the substantive elements and the proof necessary to establish the elements of that offense.

Section 951(a) provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . . shall be fined under this title or imprisoned not more than ten years,

---

[22] At the hearing on the Motions, Rafiekian contended that the sufficiency of the evidence as of the close of the Government's case in chief must be evaluated with the benefit of any additional evidence the Defendant submitted after the close of the Government's case in chief, but without any adverse inferences that may be drawn from that evidence. *See* Sept. 12, 2019 Hearing Tr. at 49:2-60:16, [Doc. No 368]. The Court grants the Defendant's Motions for Acquittal based solely on the evidence presented by the Government during its case in chief and therefore does not need to resolve this issue.

or both." Subsection (d) defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include," in relevant part, "any person engaged in a legal commercial transaction."[23] Applicable DOJ regulations define "agents" for purposes of Section 951 as "all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official, and who are not specifically excluded by the terms of [Section 951] or the regulations thereunder."[24] 28 C.F.R. § 73.1(a). As reflected in these definitions, for a person to be an agent for purposes of Section 951, it is not enough to be acting as "a representative of" or "on behalf of" a foreign government. That person must, in addition, have agreed to "to operate subject to the direction or control of that foreign government."

The word "agent" has a well-established common-law meaning. *See Restatement (Third) of Agency* § 1.01 (2006) (an agency relationship arises "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"). So too does the term "direction or control" within the context of agency, which under the common law refers to the power of the principal to give directions and the duty of the agent to obey those directions. *See Restatement (Second) Agency* § 14 cmt. a (1958) ("[T]he agent is subject to a duty not to act contrary to the principal's directions."); *id.* cmt. b. (noting that the principal "has power to give lawful directions which the agent is under a duty to obey . . ."). The statute also makes clear, as under the common law, that agency depends on subjecting the

---

[23] Under 18 U.S.C. § 951(e), the legal commercial transaction exemption in 18 U.S.C. § 951(d)(4) does not apply to those acting on behalf of certain designated foreign governments, which do not include the government of Turkey.
[24] This definition was promulgated pursuant to 18 U.S.C. § 951(b), which provides that "[t]he Attorney General shall promulgate rules and regulations establishing the requirements for notification."

"direction or control" to how a person *operates*, and that a person must do more than act as a "representative" or "on behalf of" a foreign government. *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) (agency requires the principal's ability to direct and control not only the end result of the agreement, but also "the manner and means by which the [result] is accomplished") (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) (in an agency relationship, the principal has the "right to control the manner and means by which the [result] is accomplished")); *see also Restatement (Third) of Agency* § 1.01 cmt. c (2006) (central to the existence of an agency agreement is that the principal has the ability, whether exercised or not, to direct and control the actions of its agent); *Restatement (Second) of Agency* § 2.03 (1958) (the common law fundamentally distinguishes between an "agent" and an "independent contractor," who "contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking"). These meanings and understanding are particularly applicable within the context of a commercial services contract since, were a designation of the scope of services to be provided sufficient to establish an agreement for one party "to operate subject to the direction or control" of the other, virtually every commercial contract would automatically result in an agency relationship, a result the common law of contracts and agency clearly rejects and protects against.

In *Neder v. United States*, the United States Supreme Court observed that "[i]t is a well-established rule of construction that [w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." 527 U.S. 1, 21 (1999) (internal quotation marks and citations omitted); *see also Standard Oil Co. of N.J. v. United*

*States*, 221 U.S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary."); *Stokeling v. United States*, 139 S. Ct. 544, 551-552 (2019) (rejecting a definition of "force" with respect to the crime of robbery more expansive than its common law meaning because the statute defined robbery "using terms with well-established common-law meanings."). Nothing in the text of Section 951 suggests that Congress intended to infuse into the meaning of "agent" a meaning materially different from its common law meaning with respect to its requirement that an agent "agrees to operate . . . subject to the direction or control" of a foreign principal. As the Third Circuit recognized with respect to a similar definition of an agent, the statute defines the term "substantially as in the Restatement of Agency." *See United States v. German-American Vocational League,* 153 F.2d 860 (3d. Cir. 1946). And given that settled common law meaning, it is not surprising that courts have easily rejected any constitutional challenges to Section 951 based on vagueness. *See United States v. Duran*, 596 F.3d 1283, 1291 (11th Cir. 2010) ("[T]he plain language of § 951 and its corresponding regulations . . . are readily understandable."); *see also United States v. Truong*, 629 F.2d 908, 920 (4th Cir. 1980) (holding that the term "agent" in Section 951 "is a readily understandable term which provides adequate notice of the conduct proscribed by the statute").

Despite the clear connection between Section 951's definition of "agent" and the term's common law meaning, the Government contends that "Section 951 defines the term 'agent of a foreign government' in a way that sweeps more broadly than the specific, technical principles of common law agency[,]" and that the definition of agent in Section 951 is "wholly distinct from

the common law definition of agent."[25] [Doc. No. 370 at 1-2]. It contends that "agency under the common law arises exclusively in situations of 'control,' whereas § 951 focuses on the agreement to act and includes direction, even in the absence of control."[26] [Doc. No. 370 at 2]. In substance, the Government appears to contend that a person "agrees to operate subject to the direction or control of a foreign principal" whenever he is acting on behalf of the foreign principal or agrees or is willing to do something the foreign principal requests, regardless of the foreign principal's lack of control over how that person goes about performing a contractual undertaking, or any obligation on the part of that person to follow the directions of the foreign principal.

There is no need for the Court to consider whether the definition of "agent" in Section 951 embraces the entirety of the term's common law meaning in all contexts and circumstances. Suffice it to say that, as applied in this case, the Government's construction fundamentally and

---

[25] The Government's position has evolved somewhat during the course of this case. At the post-trial hearing on the Motions, in response to the Court's question whether Section 951 substantially adopted the common law requirement and meaning of "direction and control," September 12, 2019 Hearing Tr. 2:20-24, [Doc. No. 368], the Government appeared to accept as a general proposition that it did, *see id.* at 16:6-8, but that the statute was "broader" in that it required only that there be an *agreement* for the foreign principal to exercise "direction and control" over the operational details of the engagement, not the actual exercise of that authority, *see. id.* at 17:7-10, 16-19 ("[Section 951] requires much more, that someone *agree to* operate subject to that direction and control. It doesn't actually require that day-to-day operational control be in fact exercised . . . . *I am trying to distinguish between the requirement that the Government prove that there were actual day-to-day control exercised over the agent as opposed to the existence of the capacity to do so.*") (emphasis added). But that distinction is reflected in the common law meaning of "direction and control," which refers to the power of the principal to control the actions of the agent, whether exercised or not.

[26] At the post-trial hearing on the Motions, the Government, without disputing that Section 951's definition of "agent" had a connection to its common law meaning, argued that it departs from that meaning because the statue, as worded, does not require "duality", that is, a bi-lateral agreement as to direction or control. Rather, it requires only that the agent "agrees to operate . . . subject to the direction or control" of the principal" and does not require the consent or agreement of the principal. *See* Sept. 12, 2019 Hearing Tr. at 16:6-17:10, [Doc. No 368]. But that contention effectively ignores the common understanding of what it means "to agree," particularly for the purposes of establishing an agency relationship. *See Restatement (Third) of Agency* § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). The relationship is therefore a consensual one and cannot be thrust upon someone, either as an agent or a principal. *See id.*; *see also Eital v. Schmidlapp*, 459 F.2d 609, 614 (4th Cir. 1972) (because common-law agency is based on "consent of the parties," "the intention of the parties is the significant element in determining whether the relationship exists"). In any event, there was a lack of substantial evidence to support Rafiekian's conviction even under the government's interpretation of "agent."

substantially broadens what can be discerned as Section 951's intended reach. Had Congress intended to distance the meaning of agent from its common law meaning, it would not have used words and phrases that are so directly associated with that meaning. In fact, Congress has demonstrated through the far broader definition of "agent" under FARA[27] that it knows how to use very different language when intending to adopt a meaning of agent "wholly distinct from the common law definition of agent," as the Government contends.

In sum, the government's construction of Section 951 would, in effect, import into and conflate the narrow common law notion of agency reflected in Section 951 and the related regulation with the broad definition of an "agent" under FARA, which goes well beyond any common law understanding of agency and includes conduct not fairly read into the definition of agency under Section 951. Such a reading is unwarranted not only based on the plain language of Section 951, its legislative history,[28] its common law provenance, and rules of statutory

---

[27] Section 611(c) of FARA defines "agent of a foreign principal" as follows:

(1) any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—

(i) engages within the United States in political activities for or in the interests of such foreign principal;

(ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;

(iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or

(iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and

(2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.

22 U.S.C. § 611(c). In *Att'y Gen. of the U.S. v. Irish N. Aid Comm.*, 668 F.2d 159, 161(2d Cir. 1982) (per curiam), the Second Circuit recognized that this definition is broader than the common law definition of agency, but nevertheless cautioned that the potentially expansive word "'request' . . . is not to be understood in its most precatory sense." Rafiekian was never charged with being an agent in violation of FARA.

[28] As the Court noted in its Memorandum Opinion dated July 9, 2019, Congress did not define "agent" in Section 951 until 1984 and as reflected in the legislative history, did so in response to Justice and State Department requests that "agent" be defined "narrowly" in order to address concerns about "vagueness" that had been judicially raised. [Doc. No. 292 at 21-22].

construction,[29] but also under the rule of lenity. *See United States v. Santos*, 553 U.S. 507, 514 (2008) (holding that where one possible definition of a term in a criminal statute is more "defendant-friendly" than the other, "the rule of lenity dictates that it should be adopted"). For these reasons, Section 951 is, in substance, governed by the common law meaning of "direction or control" as it pertains to the actions of an agent under Section 951.

### A. Section 951 Conviction (Count Two)

The Government has failed to offer substantial evidence from which any rational juror could find beyond a reasonable doubt that Rafiekian knowingly acted and caused others to act in the United States as an agent of a foreign government without proper notification to the Attorney General in violation of 18 U.S.C. § 951.[30]

First, there is no substantial evidence that Rafiekian agreed to operate subject to the direction or control of the Turkish government. There is no evidence of any actual or implied agreement between Rafiekian and the government of Turkey or any official of the government of Turkey.[31] In fact, the only contact between Rafiekian and any Turkish official occurred during the September 19, 2016 meeting, and there is no evidence concerning anything said at that meeting from which a rational juror could find that Rafiekian had agreed to operate at the

---

[29] Under the rule of statutory construction *noscitur a sociis,* the meaning of "direction" in Section 951 is also informed by the word "control," particularly given the common law understanding of those words as they pertain to agency.

[30] The jury was instructed that the Government was required to prove that Rafiekian: (1) "acted in the United States as an agent of a foreign government"; (2) "failed to notify the Attorney General of the United States that he would be acting in the United States as an agent of the foreign government prior to so acting"; (3) "acted knowingly, that is, that he knew he was a person who agreed to operate within the United States subject to the direction or control of a foreign government or official and to engage in conduct other than a 'legal commercial transaction' . . . and that he knew he had not provided prior notification to the Attorney General"; and (4) "acted, at least in part, as an agent for a foreign government in the Eastern District of Virginia, during the time period alleged in the indictment." *See* [Doc. No. 354-5 at 50-51] (Jury Instruction No. 41).

[31] The Government thoroughly searched Rafiekian's email and Skype communications, *see* Trial Tr. 770:3-18, 781:1-17, 782:14-19, [Doc. No. 333] (Alfredo), without finding evidence of any e-mail, Skype, or telephone communications between Rafiekian and any Turkish official.

direction or control of the Turkish government.[32] Nor do any of the actual agreements in evidence reflect any involvement by the Turkish government or any agreement by Rafiekian to operate subject to its direction and control; in fact, they all explicitly disclaim any agency relationship.[33] The Government's entire case therefore substantially boils down to Rafiekian's interactions with Alptekin and its contention that Alptekin and Inovo were "intermediaries" for the Turkish government, through whom the Turkish government obtained Rafiekian's agreement to operate subject to its direction and control.

There was no competent evidence from which the jury could find that Alptekin acted as the type of "intermediary" the Government contends. In fact, the only evidence of any association between Alptekin and the Turkish government in connection with FIG's retention is reflected in the hearsay statements of Alptekin to Rafiekian, which were admitted not as proof of Alptekin's relationship or role relative to Turkey, but solely as evidence of what Alptekin told Rafiekian. Accordingly, the jury had no evidence of what Alptekin's actual relationship or role was relative to the Turkish government,[34] and because of that absence of evidence could not find for its purposes in deciding the case that Alptekin was, in fact, operating as an agent, alter ego, representative, "cut-out", or any other type of "intermediary" for the Turkish government.[35] The

---

[32] The only evidence concerning the substance of any communications at that meeting is that there were no communications directly between Rafiekian and the Turkish officials who were present, *see* Trial Tr. 441:3-5, [Doc. No. 330] (McCauley), and there was no discussion about the FIG contract with Inovo, *see id.* at 440:14-17, 442:1-3.

[33] These agreements include the Independent Advisory Services Agreement signed by Alptekin on behalf of Inovo and Flynn on behalf of FIG, GEX 58, the related agreement between FIG and Alptekin, GEX 127B, and FIG's consulting agreement with Sphere, GEX 107B.

[34] Rafiekian told a U.S. government agency shortly after the September 19, 2016 meeting that Alptekin had "senior level contacts in the Turkish government," DEX 14, but without more, this statement is insufficient to establish that Alptekin was acting as an agent or on behalf of the Turkish government for the purpose of enlisting Rafiekian as a Turkish agent, or that Rafiekian thought so.

[35] As evidence of Alptekin's role as a Turkish government intermediary relative to Rafiekian, the Government points to Alptekin's role in facilitating a 2017 meeting between Sphere and the Turkish government over a possible consulting contract, having nothing to do with FIG, Rafiekian, Flynn, or the FIG engagement. In this regard, in December 2016 or early January 2017, after FIG had been dissolved, and the FIG project terminated, Alptekin reached out to Sphere directly and told it that the Turkish government was soliciting RFP's for external public relations advisors. *See* Trial Tr. 650:4-11, [Doc. No. 331] (Miller). Sphere subsequently received an email from

26

question therefore reduces to whether what Alptekin told Rafiekian, when viewed in combination with the other evidence in the case, was sufficient for a rational juror to find beyond a reasonable doubt that Rafiekian knowingly acted as an undisclosed agent of the Turkish government.[36]

Nothing Alptekin said to Rafiekian was sufficient for a rational juror to find that Rafiekian had agreed to act or was knowingly acting as an agent of the Turkish government. There is nothing in those communications that could be construed as a request that Rafiekian do so or an agreement by Rafiekian to do so. What Alptekin said about his interactions with Turkish officials, or his own motivations or instructions, did not reflect any expectation by the Turkish government that by entering into a commercial contract with Inovo, Rafiekian would be acting or agreeing to act as its agent. Likewise, there is no evidence of any statements by Rafiekian that would allow a rational juror to find that Rafiekian had agreed to operate as an agent of the Turkish government, or that he thought he was acting as a Turkish agent. That Rafiekian expressed sentiments aligned with the well-known publicly stated views, goals, and objectives of the Turkish government or that he expressed admiration for the Turkish President is not a sufficient evidentiary basis for a juror to find, without improperly speculating, that Rafiekian had signed on as a Turkish agent.

Nor could a rational juror find a violation of Section 951 based on Rafiekian's conduct during the course of the engagement with Inovo. The engagement was memorialized in written

---

Turkish embassy officials asking that it give a pitch presentation at the Turkish embassy, which Courtovich believed came about as a result of Alptekin's connections. *Id.* at 751:13-752:21, [Doc. No. 333] (Courtovich). Sphere submitted a public affairs proposal to the Turkish government on January 25, 2017, DEX 51, which it then presented during a meeting at the Turkish embassy on January 30, 2017, *see* DEX 51. Sphere was ultimately not retained for this engagement. Trial Tr. 753:16-17, [Doc. No. 753], (Courtovich).

[36] Even if the substance of Alptekin's hearsay statements could be considered for their truth, they do not allow for the reasonable inference that Rafiekian was being retained through Alptekin as a Turkish agent. At most, they establish that Alptekin sought approval from the Turkish government before entering into the agreement with FIG on behalf of Inovo.

agreements that disclaimed any agency relationships, and while what the parties call their relationship is not controlling, there is no evidence sufficient to establish an agency relationship between Rafiekian and Turkey. Rafiekian essentially subcontracted or otherwise assigned the entirety of the work associated with the engagement to others, including Sphere, and within FIG, Flynn, who was designated as the engagement's lead, McCauley, who was the investigation lead, and Boston, the engagement coordinator, none of whom the Government contended were themselves acting as Turkish agents.[37] Thus, the evidence is that the work contemplated by the engagement was to be performed, and was actually performed, largely by individuals other than Rafiekian; and there is no evidence that Rafiekian, or Alptekin for that matter, was channeling instructions from the Turkish government concerning the day-to-day operational details of that work.

Similarly, nothing in the structure of this commercial engagement gives rise to a reasonable inference that Rafiekian was acting as an agent of, or even on behalf of, the Turkish government. The relationship between Alptekin and FIG/Rafiekian was structured as a commercial contract between Inovo and FIG, who entered into an Independent Advisory Services Agreement, as well as a related supplemental consulting agreement between Alptekin and FIG. The Government contends that the payments made to FIG from Inovo and from FIG to Alptekin allows the inference that Rafiekian was acting as an agent of the Turkish government or that Alptekin was acting as the agent of Turkey in retaining FIG. But there is no evidence, direct or otherwise, sufficient to reasonably infer that Turkey funded the engagement of FIG, or that the engagement was not in fact being funded by a group of Turkish businessmen, as Rafiekian stated consistently

---

[37] On the eve of trial, after explicitly disclaiming his involvement in any conspiracy throughout the case, the Government for the first time contended that Flynn was a member of the alleged conspiracy, although it never alleged that he was acting as a Turkish agent. The details of that change in position are discussed *infra* note 44.

throughout.[38] *See, e.g.,* Trial Tr. 395:19-24, [Doc. No. 330] (McCauley); 333:11-16, [Do. No. 333] (Courtovich). And as the Court has previously observed, FIG's payments to Alptekin, no matter how Rafiekian characterized them over time, are insufficient to support the inference that Rafiekian was acting or had agreed to act as a Turkish agent. *See* [Doc. No. 292 at 31]. Ultimately, nothing about the structure of FIG's contracts with Inovo and Alptekin or the payments made pursuant to those contracts gives rise to a reasonable or rational inference that Rafiekian had acted or agreed to act as an agent of the Turkish government.[39] Nor do Rafiekian's statements to Covington constitute substantial evidence from which a rational juror could find beyond a reasonable doubt that Rafiekian had agreed to operate as a Turkish agent.

Even assuming there was sufficient evidence from which a reasonable jury could conclude Rafiekian was acting or had agreed to act "on behalf of the Turkish government" (which the Court does not find), such a showing by itself, as the Government concedes, is not enough to convict under Section 951; adequate proof of an agreement to operate subject to Turkey's direction or control was also required. The government failed to carry that burden. Apart from identifying the scope of services and overall objective for FIG's engagement – a public relations effort, contemplating a never-produced video to support the extradition of Gulen

---

[38] The only direct evidence concerning the flow of funds is that Alptekin paid FIG from his personal bank account, without any evidence concerning the source of those funds. The Government relies heavily on Alptekin's statement the day after a meeting between him and a Turkish government official that certain funds were in his account, *see* GEX 67K, but Alptekin's hearsay statement was admitted only as evidence of what was said to Rafiekian and provides no competent evidence upon which a juror could make a funding that the Turkish government provided the funds; and such an inference would in any event be impermissibly speculative. *See Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958) (holding that an inference is not "permissible" when it "is so tenuous that it rests merely upon speculation and conjecture").

[39] The sufficiency of the evidence and the inferences that can rationally be drawn cannot be divorced from the commercial context of this case, which is fundamentally different from the espionage-related contexts the Government points to where convictions under Section 951 were sustained based on an individual's agreement with an "intermediary" without any direct contact with foreign officials. Here, there is no passing of classified information through an intermediary as in *Truong*, 629 F.2d 908, 911-12, or *United States v. Boyce*, 594 F.2d 1246 (9th Cir. 1979), *cert. denied*, 444 U.S. 855; or any direct interaction with known agents of foreign intelligence services as in *United States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009).

to Turkey by the U.S. government, there is no substantial evidence that Inovo, Alptekin, or the Turkish government exercised the requisite direction or control. As mentioned above, in addition to Rafiekian, many others were involved in determining how to proceed with that work, including centrally Sphere, who controlled the details of the proposed video and at least some of the related research and interviews, and who came up with the idea of creating a board game called Gulenopoly. There is no evidence, not even in the hearsay statements from Alptekin to Rafiekian, that Alptekin, Inovo, or anyone associated with the Turkish government directed or controlled the work performed by FIG or Sphere personnel. Indeed, the lack of direction or control over Rafiekian, FIG, and its consultants is reflected in the accounts of Alptekin's disappointment in what FIG and Sphere presented to Alptekin at the November 2, 2016 meeting, *see* Trial Tr. 723:3-9, [Doc. No. 333] (Courtovich); 431:23-432:4, 444:6-8, [Doc. No. 330] (McCauley).

This lack of direction or control is also reflected in Rafiekian's, FIG's, and Sphere's rejection of requests or suggestions by Alptekin.  For example, in the one instance where Alptekin inquired as to whether FBI or other government information could be accessed through FIG's contacts with former FBI agents, his suggestion was rejected out of hand. *See* Trial Tr. 442:13-443:20, 444:6-16, [Doc. No. 330] (McCauley). Similarly, on another occasion, Rafiekian told Flynn that Alptekin had "shared some very specific expectations with [him]" for work beyond that which was contemplated in the agreement between FIG and Inovo, and that Rafiekian had "told him that the expectations are unreasonable" and "dismissed [them] immediately." GEX 29.  FIG and the consultants it retained based their work on open source research, most of which was conducted by people and companies other than Rafiekian and FIG, was never disseminated, and was to a large degree duplicative of research that the Turkish

30

government had already hired the law firm Amsterdam & Partners LLP to perform.[40] *See* Trial. Tr. 425:13-15, 428:10-18, [Doc. No. 330] (McCauley); *id.* at 592:1-593:11, [Doc. No. 331] (Neer). The Government points to FIG's periodic reports concerning the progress of the work, contemplated under the Agreement, as evidence of direction or control, but there is no evidence that those updates were used to pass on what were viewed as binding instructions from the Turkish government.

Finally, the Government points to the op-ed published by Flynn on November 8, 2016 and Rafiekian's statement to Alptekin that "a promise made is a promise kept" as sufficient evidence that Rafiekian was a Turkish agent. But there is no evidence that the op-ed had been requested by the Turkish government, either directly or through Alptekin; or that it was Rafiekian, as opposed to Flynn, who decided to have the op-ed published at that time.

The Government essentially contends that the jury could have considered all of this evidence, weighed it, rejected it, and found otherwise. But there was no substantial evidence upon which a rational jury could have found otherwise without impermissible speculation and conjecture. For the above reasons, the Government has failed to present substantial evidence sufficient for a rational juror to find beyond a reasonable doubt that Rafiekian acted or caused others to act as an agent of a foreign government in violation of 18 U.S.C § 951.

### B. Conspiracy Conviction (Count One)

Rafiekian was also convicted of conspiracy to (1) act as an unregistered agent of a foreign government in violation of Section 951; and (2) make willful and material false statements and omissions in a FARA filing in violation of 22 U.S.C. § 618(a)(2).[41] In order to

---

[40] Amsterdam's research and Turkey's involvement with that research was disclosed in FARA filings. *See* GEX 147, 148, 149 (Amsterdam FARA filings naming "Republic of Turkey" as the foreign principal).
[41] The Government never charged Rafiekian with a violation of FARA.

convict Rafiekian of this charge, the Government was required to prove beyond a reasonable doubt that: (1) the conspiracy, agreement, or understanding to violate Sections 951 and 618(a) was formed, reached, or entered into by two or more persons; (2) at some time during the life of the conspiracy, Rafiekian knew its purpose; (3) Rafiekian deliberately joined the conspiracy with knowledge of its purpose; and (4) at some time during the life of the conspiracy, one of its members knowingly performed an overt act to further or advance its purpose. [Doc. No. 354-5 at 38] (Jury Instruction No. 33).

"By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc), *cert. denied*, 519 U.S. 1151 (1997) (citing *Blumenthal v. United States*, 332 U.S. 539, 557) (1947)). Thus, while there may in some instances be direct evidence of conspiracy, "a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced," and may even be proved "wholly by circumstantial evidence." *Id.* at 857-58 (citing *Ianelli v. United States*, 420 U.S. 770, 777 n.10 (1975)). Nevertheless, the conspiracy and the defendant's participation in it "must be more than mere speculation and conjecture," and a conspiratorial agreement may not be established through unreasonable inferences, or speculation based on an attenuated series of speculative inferences. *United States v. Gengler*, 2009 WL 5549225, at *8 (E.D. Va. Oct. 23, 2009) (citing *Harms v. United States*, 272 F.2d 478, 483 (4th Cir. 1959)); *see also Ford Motor Co.*, 259 F.2d at 266. Thus, on a Rule 29 motion, the Court must determine whether the circumstantial evidence of a conspiracy is sufficient as a matter of law to allow the inference of the charged conspiracy, or whether the conclusion that the charged conspiracy existed is reached only after a rational juror would have moved from reasonable inference to impermissible speculation.

For substantially the same reasons as outlined above with regard to Count Two, the evidence presented would not allow a rational jury to conclude beyond a reasonable doubt that there was an agreement, express or implied, to violate Section 951 or that Rafiekian knowingly participated in any such agreement. That conclusion is underscored by other uncontradicted evidence, discussed below, concerning Rafiekian's efforts to comply with any registration or notification requirements, including his consultations with two law firms concerning FIG's registration obligations, FIG's filing under the LDA on the advice of a lawyer, and his voluntary disclosure to U.S. authorities on September 28, 2016 concerning the FIG engagement arranged through Alptekin "as a business contact" who had "senior level contacts in the Turkish government." *See* DEX 14.

Nor has the Government presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Rafiekian conspired with Alptekin or anyone else to violate 22 U.S.C. § 618(a)(2). There is no evidence of discussions or suggestions, let alone an agreement, express or implied, to either avoid filing under FARA or to cause the filing of a false FARA registration statement. As referenced above, following his conversations with Alptekin in August 2016 and in anticipation of FIG's engagement with Inovo pertaining to Gulen, Rafiekian consulted with two law firms concerning his obligations to register under FARA before ultimately filing under the LDA in accordance with the legal advice he obtained. Likewise, Sphere, the experienced consultants retained by FIG, also considered their registration obligations and chose to file under the LDA after consulting with legal counsel. *See* Trial Tr. 639:15-640:2, [Doc. No. 331] (Miller). The Government contends that these filings simply reflected Rafiekian's misrepresentations to his lawyers and to his consultants concerning his true relationship with the Turkish government or on whose behalf he and FIG were acting. But for the

reasons discussed above, there is no evidence sufficient to establish that Rafiekian was, or thought he was, working as an agent of the Turkish government, or that the "client" was not, in fact, Inovo.

Nor can any conspiracy to violate FARA be inferred from the FARA filing itself for the reasons previously stated in the Court's July 9, 2019 Order, which is incorporated herein by reference. *See* [Doc. No. 292 at 8-11, 29-31]. The superseding indictment alleges that the alleged conspiracy began from at least July 2016; but the DOJ did not even raise the specter of a need for a FARA filing until its letter to Flynn dated November 30, 2016 (which did not become known to Flynn until December 24, 2016), by which time FIG had ceased operations and was not performing any work for Inovo or anyone else. More centrally, there is no evidence of any communications between Rafiekian and anyone else concerning the substance of any FARA filing other than with Covington during its investigation into whether a FARA filing was necessary after it was retained by FIG and Flynn in December 2016 or early January 2017.[42]

The Government claims "the three co-conspirators [Rafiekian, Flynn, and Alptekin] again gave substantially identical explanations [in the FARA filings] that the jury plainly deemed false and used as further evidence of a concerted agreement to lie."[43] [Doc. No. 365 at 20]. But that contention ignores the lack of evidence to establish the presumed conspiracy, or any agreement, among these three individuals concerning the FARA filing, as discussed above. In fact, until the

---

[42] The Government points to Rafiekian's e-mail to Alptekin on November 11, 2016, GEX 83, as evidence of the alleged conspiratorial agreement with respect to a FARA filing. But the e-mail does not mention or suggest FARA or any other registration requirement; and Rafiekian's statements, which reflect what Rafiekian had consistently said throughout concerning the FIG engagement, were not made in a context or for any discernable purpose that would allow a rational inference that Rafiekian was instructing or soliciting Alptekin to cause the filing of a false FARA registration, particular since at that point in time,  neither DOJ, nor anyone else, had raised the prospect of a FARA filing.

[43] Rafiekian was not charged with a substantive violation of FARA under Section 618(a)(2) or otherwise, and there is no need for the Court to decide the sufficiency of the evidence as to the materiality or falsity of the alleged misrepresentations in the March 7, 2017 FARA filing.

eve of trial, the Government contended that Flynn was not part of the alleged conspiracy.[44] There were also material differences in the explanations these individuals gave to Covington, particularly by Alptekin, but even accepting the Government's characterization, no inference of a conspiracy could be drawn from those statement by themselves. *See Bell Atlantic v. Twombly,* 550 U.S. 544, 564-566 (2007) (parallel conduct by itself does not plausibly allege a conspiratorial agreement). For the above reasons, the Government failed to present substantial evidence for a rational juror to find beyond a reasonable doubt that Rafiekian knowingly participated in a conspiracy to (1) act as an unregistered agent of a foreign government in violation of Section 951; and (2) make willful and material false statements and omissions in a FARA filing in violation of 22 U.S.C. § 618(a)(2).

### C. Motion for a New Trial

Finally, given the great weight of the evidence, as detailed above, the Court also finds that it would be in the interests of justice to vacate the judgment of conviction, and therefore conditionally orders a new trial in the event the Court's order of acquittal is vacated or set aside as to some or all of the counts of conviction. Moreover, the Court concludes that a new trial is warranted on the grounds that (1) the jury was not adequately instructed as to the use of the

---

[44] The Government's position with respect to Flynn is particularly telling. The evidence of Flynn's involvement in the engagement paralleled, and in some aspects, exceeded that of Rafiekian, as Flynn signed the agreements between FIG and Inovo and FIG and Alptekin, was privy to Alptekin's communications with FIG and engaged in conversations directly with him, issued the op-ed, participated in the meeting with Turkish government officials on September 19, 2016, and was designated as the lead on FIG's engagement with Inovo. Rafiekian was first indicted on December 12, 2018 [Doc. No. 1], and a superseding indictment was issued on May 23, 2019 [Doc. No. 141], and the Government did not allege in either the original indictment or the superseding indictment that Flynn was a member of the alleged conspiracy or an agent of the Turkish government. Nor did the Government allege that Flynn was a member of the alleged conspiracy in its response to a court-ordered Bill of Particulars. *See* [Doc. No. 109]. With full knowledge of Flynn's involvement, the Government told the Court as recently as June 13, 2019, that Flynn was not a member of the alleged conspiracy, *see* June 13, 2019 Hearing Tr. 65:9-22, [Doc. No. 213], only to notify the Court of its change in position on July 3, 2019, *see* [Doc. No. 261], not because of Flynn's known involvement as outlined above or any other involvement, but because it no longer planned to call Flynn as a witness pursuant to his cooperation agreement with the Government, even though Flynn was prepared to testify.

admitted hearsay statements; (2) the jury was not adequately instructed as to the role of Michael
Flynn; and (3) the jury was not adequately instructed as to the knowledge element necessary to
convict Rafiekian of a violation of Section 951, as charged in Count Two.

Given the volume of admitted hearsay statements by Alptekin, and the substance of those
statements, the jury was not adequately instructed as to the limited proper use of those statements
and, more specifically, that those statements were not competent evidence upon which to find
any involvement of the Turkish government or that Alptekin had any particular relationship or
role relative to the Turkish government. The sheer volume of hearsay statements by Alptekin
raised a substantial danger that absent adequate instructions, the jury would rely on those
statements for an improper purpose – namely, as substantive proof of Turkey's involvement,
Alptekin's relationship and role relative to the Turkish government, and the events and
communications referenced in those statements. While the jury was instructed on the limited
purpose for which those statements were admitted at the time of their admission and was
instructed generally as to their proper use at the close of the case,[45] a more detailed instruction
with more specific restrictions on their use was warranted, particularly given that a jury could
easily understand the Government's reference to those statements in closing argument as an
invitation to consider the truth of those statements. As a result, the volume and use of these
hearsay statements likely ". . . vitiat[ed] any possible curative function that the judge's limiting
instruction might have otherwise served." *See United States v. Ince*, 21 F.3d 576, 584 (4th Cir.
2013).

Similarly, the jury was not adequately instructed as to the role of Michael Flynn in light
of the Government's in-court judicial admission that Flynn was not a member of the alleged

[45] Those instruction are set forth in Jury Instruction Nos. 18 (Evidence Admitted for a Limited Purpose Only); and
19 (Declarations of Co-Conspirators and Others). [Doc. No. 354-5 at 21-22].

conspiracy and the lack of evidence sufficient to establish his participation in any conspiracy; and there was a substantial danger that the jury drew inferences against Rafiekian with respect to the existence of and his participation in the alleged conspiracy based on a belief that Flynn could be regarded as a member of the alleged conspiracy, particularly given the Government's use of Defendant's Exhibit 66 to support its claim that Rafiekian participated in the alleged conspiracy, even though the information in that exhibit related solely to Flynn and explicitly excluded Rafiekian.[46]

Finally, the Court concludes that the jury was not adequately instructed as to the knowledge element necessary to convict Rafiekian of a violation of Section 951, as charged in Count II. In its July 9 Order, the Court concluded that in order to prove a violation of Section 951, an essential element of the offense is that the defendant engaged in conduct that was not an excluded legal commercial transaction. [Doc. No. 292 at 22].

In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court considered the *mens rea* requirement within the context of 7 U.S.C § 2024(b)(1), which imposes criminal liability on "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations." *Id.* at 420 (alterations in original). The Court concluded that the *mens rea* requirement under this general intent statute required the Government to prove that the defendant knew he was acting in a manner not authorized by statute or regulation. *Id.* at 433. In reaching that conclusion, the Court recognized that "the failure of Congress explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from th[e] background assumption of our criminal

---

[46] Given the Court's Rule 29 ruling, there is no need for the Court to consider at this time the substantial issues Rafiekian has raised with respect to the adequacy of the information he was provided regarding the matters referenced in Defendant's Exhibit 66.

law"; namely, that criminal offenses requiring no *mens rea* have a generally disfavored status. *Id.* at 426. The Court also concluded that "[t]his construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Id.* The Supreme Court also recognized in *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) that "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."

Here, Section 951 imposes criminal liability on "whoever . . . acts . . . as an agent of a foreign government without prior notification to the Attorney General if required [under regulations promulgated by the Attorney General]." 18 U.S.C § 951(a). The statute also provides that the term "agent of a foreign government" does not include "any person engaged in a legal commercial transaction." 18 U.S.C § 951(d)(4). Based on the text, structure, and history of Section 951, the Court concluded in its July 9 Order that the legal commercial transaction provision in subsection (d) establishes an offense element rather than an affirmative defense. [Doc. No. 292 at 22]. Accordingly, the jury was instructed that in order to establish a violation of Section 951 as alleged in Count II, the Government must prove beyond a reasonable doubt, *inter alia*, that Rafiekian "acted knowingly, that is, that he knew he was a person who agreed to operate within the United States subject to the direction or control of a foreign government or official and to engage in conduct other than a 'legal commercial transaction,' as defined in [another instruction]; and that he knew he had not provided prior notification to the Attorney General." [Doc. No. 354-5 at 50] (Jury Instruction No. 41).

Based on *Liparota* and *X-Citement*, the Court concludes that the *mens rea* requirement for a conviction under Section 951 applies to the legal commercial transaction element of that offense, which requires affirmative proof that the defendant engaged in something other than a

38

legal commercial transaction. Imposing such a *mens rea* requirement is particularly appropriate here because, as in *Liparota,* "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." 471 U.S. at 426. Accordingly, the Government must prove not only that the commercial transaction the defendant was engaged in was illegal but also that the defendant knew it was illegal. The jury was not so instructed.[47]

## IV. CONCLUSION

For the above reasons, the evidence was insufficient as a matter of law to sustain either of Rafiekian's convictions, and the Motion for Acquittal is therefore GRANTED. Should the Court's judgment of acquittal be later vacated or reversed, a new trial is warranted in the interests of justice, and the Motion for New Trial is conditionally GRANTED.

The Court will issue an appropriate Order.

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 24, 2019

---

[47] In its July 9 Order, the Court observed that "[a]lthough Rafiekian is not charged with a FARA violation under 22 U.S.C. § 612 (a), these activities would violate FARA, and therefore be illegal, if they are covered activities and Rafiekian willfully engaged in them as an agent of the Turkish government without a proper FARA registration." [Doc. No. 292 at 24] (internal citations and footnotes omitted). Based on that statement, Rafiekian took the position that the Government was required to prove that he acted willfully in order to establish that the commercial transaction was "prohibited by federal or state legislation or implementing regulation," as required under 28 C.F.R. 73.1(f); and the jury should be so instructed. Upon review, the Court concluded that the willfulness requirement for the imposition of criminal liability under Section 618(a) did not apply to establishing the illegality of a commercial transaction since under Section 612, any designated conduct is simply prohibited without registration as an agent.